**2015 UT App 160**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
JACE ROBERT ISOM,
Defendant and Appellant.

Opinion
No. 20130740-CA
Filed June 25, 2015

Fifth District Court, St. George Department
The Honorable James L. Shumate
No. 121500737

Edwin S. Wall, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES JAMES Z. DAVIS and KATE A. TOOMEY concurred.

VOROS, Judge:

¶1 Defendant Jace Robert Isom appeals three first degree felony convictions, two for aggravated sexual abuse of a child and one for rape of a child. The child in question was the five-year-old daughter of Isom's live-in girlfriend. Isom challenges a handful of alleged errors at trial, none of which, singly or in combination, requires reversal. We therefore affirm.

BACKGROUND[1]

¶2     The child was five years old when her mother moved in with Isom. The child and her older brother stayed with their mother and Isom on weekends. Isom sexually abused the child on multiple occasions. The child's mother participated in some, but not all, instances of the abuse.

¶3     Isom admitted to a friend that he and the child's mother had been abusing the child. Isom did so during a conversation in which he invited his friend to engage in a sexual "threesome" with Isom and the child's mother. While discussing this invitation, Isom told his friend "about what was going on with [the child]." Isom explained that the child's mother had been abused as a child and that "one of her fantasies" was "to do it with her children as well." Isom then disclosed details of the child's abuse. Isom's friend "didn't want to have anything to do with what was going on."

¶4     About six months later, Isom's friend told the child's paternal aunt about the abuse. The child's aunt relayed this information to the child's father, who in turn contacted Isom's friend. After learning the details of the abuse, the child's father asked the child if anything bad was happening to her while she was staying with her mother and Isom. The child told her father that Isom "had touched her on her bad spot."

¶5     The child's father told the child's school counselor about the abuse, but when the counselor interviewed her, the child denied the abuse. The Children's Justice Center (the CJC) interviewed the child the next day. In a recorded interview at the

_____

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Brown*, 948 P.2d 337, 339 (Utah 1997). "We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346.

CJC, the child acknowledged the abuse and said that she had not disclosed it, because she was afraid of getting in trouble. Isom told her "like a thousand times" not to tell anyone, and that he would ground her if she did.

¶6     At trial, Isom was convicted on two counts of aggravated sexual abuse of a child and on one count of rape of a child. He appeals.

ISSUES ON APPEAL

¶7     Isom asserts seven claims of error on appeal. First, he contends that the trial court violated his due process rights by failing to provide him with an arraignment hearing.

¶8     Second, Isom contends that insufficient evidence supported his conviction because the child did not identify him as her abuser at trial.

¶9     Third, Isom contends that the "prosecutor committed plain error" by arguing in closing that the jurors should put themselves in the child's shoes and that his trial counsel rendered constitutionally ineffective assistance by failing to object to the prosecutor's comments.

¶10     Fourth, Isom contends that the trial court violated his Confrontation Clause rights by placing a whiteboard barrier between Isom and the child as she testified about her abuse.

¶11     Fifth, Isom contends that the trial court erred in permitting the prosecuting attorney to ask leading questions when directly examining the child.

¶12     Sixth, Isom contends that the trial court plainly erred in permitting other-acts evidence against him under rule 404(b) of the Utah Rules of Evidence and that his trial counsel rendered constitutionally ineffective assistance by failing to challenge this evidence.

¶13  Finally, Isom contends that the cumulative effect of the trial court's errors and his trial counsel's constitutionally ineffective assistance requires reversal.


ANALYSIS

I.  Due Process

¶14  Isom contends that the trial court violated his due process rights by failing to provide him with an arraignment hearing. Isom asserts that he "was never arraigned"; that "he was never read the indictment, nor asked if he waived the reading"; and that he "was never advised by the court of the substance of the charges against him, nor called upon to enter a plea." Because "the accused in a felony case is always entitled to an arraignment and plea before . . . trial," *State v. Peterson*, 681 P.2d 1210, 1215 (Utah 1984) (citation and internal quotation marks omitted), Isom argues that the trial court's failure to provide these procedural safeguards violated his due process rights. The State responds that Isom did not preserve this claim at trial and that he does not argue any exception to the preservation requirement on appeal.

¶15  "[T]o preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *Pratt v. Nelson*, 2007 UT 41, ¶ 15, 164 P.3d 366 (citation and internal quotation marks omitted). Isom concedes that he did not preserve this claim at trial but asserts on appeal the exceptional-circumstances exception to the preservation rule. *See Kell v. State*, 2012 UT 25, ¶ 36, 285 P.3d 1133. "'[E]xceptional circumstances' is a concept that is used sparingly, properly reserved for truly exceptional situations," such as "'rare procedural anomalies.'" *State v. Irwin*, 924 P.2d 5, 11 (Utah Ct. App. 1996); *see also State v. Nelson-Waggoner*, 2004 UT 29, ¶ 23, 94 P.3d 186.

¶16  The exceptional-circumstances doctrine does not aid Isom for three reasons. First, Isom asserts the exception for the first

time in his reply brief. "It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 (citation and internal quotation marks omitted).

¶17    Second, Isom's reply brief fails to adequately analyze the claim. An appellant's brief must "contain the contentions and reasons of the appellant with respect to the issues presented, . . . with citations to the authorities, statutes, and parts of the record relied on." Utah R. App. P. 24(a)(9). Briefs require "not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998). "An issue is inadequately briefed when the overall analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *State v. Davie*, 2011 UT App 380, ¶ 16, 264 P.3d 770 (citation and internal quotation marks omitted).

¶18    Here, Isom makes a single reference to the exceptional-circumstances doctrine in his reply brief, stating that we "should address [the due process] issue because it is a[n] exceptional circumstance in every regard." But his argument lacks even "bald citation to authority" and, in any event, contains no "development of that authority [or] reasoned analysis based on that authority." *Thomas*, 961 P.2d at 305. Because "[a]n inadequately briefed claim is by definition insufficient to discharge an appellant's burden to demonstrate trial court error," Isom's due process challenge fails. *Simmons Media Group, LLC v. Waykar, LLC*, 2014 UT App 145, ¶ 37, 335 P.3d 885.

¶19    Third, there is nothing exceptional about these circumstances. The exceptional-circumstances doctrine "is a concept that is used sparingly, and properly reserved for truly exceptional situations, for cases . . . involving rare procedural anomalies." *State v. Kozlov*, 2012 UT App 114, ¶ 35, 276 P.3d 1207 (omission in original) (citation and internal quotation marks omitted); *see also State v. Dunn*, 850 P.2d 1201, 1209 n.3 (Utah

1993). Moreover, we reserve the exceptional-circumstances doctrine for "the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice." *Nelson-Waggoner*, 2004 UT 29, ¶ 23. Isom fails to identify any rare procedural anomaly or truly exceptional circumstance. Accordingly, we decline to review his due process claim.

## II. Sufficiency of the Evidence

¶20 Isom next contends that insufficient evidence supported his convictions because the child never identified Isom as her abuser at trial. Isom argues that "[e]ven when viewing the evidence in the light most favorable to the [S]tate, and drawing all inference[s] in favor of the verdict, no evidence identifies [Isom] as . . . having committed the offenses." The State responds that Isom did not preserve this claim and that, in any event, sufficient evidence supported his convictions.

¶21 "As a general rule, claims not raised before the trial court may not be raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 11, 10 P.3d 346. Rule 12(a) of the Utah Rules of Criminal Procedure requires a motion to "state succinctly and with particularity the grounds upon which it is made and the relief sought." "Where the grounds upon which a motion is made before the trial court differ from the grounds argued on appeal, appellate courts will generally dismiss those arguments as unpreserved." *State v. Gonzalez*, 2015 UT 10, ¶ 24, 345 P.3d 1168 (citing *State v. Meza*, 2011 UT App 260, ¶ 4, 263 P.3d 424). For example, a motion for a directed verdict on the ground that the evidence failed to tie the defendant to the crime does not preserve a claim that the evidence failed to show defendant used or threatened to use a dangerous weapon. *See Meza*, 2011 UT App 260, ¶ 4.

¶22 That said, a generic motion for directed verdict will preserve a specific ground for appeal when "the specific ground for an objection is clear from its context." *Gonzalez*, 2015 UT 10, ¶ 26. Thus, for example, a defendant's motion for directed

verdict on the general ground that the State failed to meet its burden to prove all the elements of murder preserves a self-defense sufficiency challenge where "the trial court would necessarily have understood from the context that [the defendant] was asserting that the State had failed to meet its burden of showing that he had not acted in self-defense." *Id.*

¶23 Here, Isom contends that his motion for directed verdict preserved his sufficiency claim. However, on appeal Isom asserts a different ground than he did at trial. At trial, Isom sought a directed verdict based on "the credibility and inconsistent statements of the State's witnesses." But on appeal Isom does not challenge the witnesses' credibility or the consistency of their statements; instead, he challenges the sufficiency of the evidence supporting his identity as the child's abuser. The trial court would not necessarily have understood from his motion for directed verdict that he was asserting a failure of the State's evidence on identification. Accordingly, Isom's motion for directed verdict based on witness credibility did not preserve his appellate claim for insufficiency of the evidence. Because Isom did not preserve his sufficiency claim at trial and argues no exception to the preservation rule on appeal, we decline to review it.[2]

---

2. We do observe that several witnesses testified to Isom's identity as the child's abuser. The child testified that she knew "Jace Isom," who lived with her mother, and that Isom had abused her. Isom's friend also testified that he knew "the defendant, Jace Isom," and that Isom had admitted to sexually abusing the child. Isom's sufficiency claim wrongly assumes that he could not be convicted without an in-court identification. "It is well-settled that an essential element that the government must prove beyond a reasonable doubt is the identification of a defendant as the person who perpetrated the crime charged." *United States v. Boyd*, 447 F. App'x 684, 690 (6th Cir. 2011). "It is equally well-established that identification can be inferred from

(continued…)

III. Appealing to the Passions of the Jury

¶24    Isom contends that the "prosecutor committed plain error by appealing to juror[s'] sympathies and invoking their passions during closing arguments." Specifically, he argues that the prosecutor improperly asked the jurors "to put themselves in the victim's place" and "to empathize with the child's alleged experience," and that the trial court plainly erred in failing to intervene sua sponte. In the alternative, Isom contends that his trial counsel rendered constitutionally ineffective assistance by not objecting to the prosecutor's statements, because "no sound trial strategy would condone [counsel's] decision to remain silent." The State responds that a "reasonable trial strategy supported [counsel's] decision" not to object to the statements and that, in any event, "the prosecutor's argument was proper."

¶25    At trial, the child had difficulty answering questions about the sexual abuse. She answered many of the prosecutor's questions about the details of the abuse with "I forgot" or "I don't remember." On cross-examination, Isom's trial counsel probed further, asking whether the child had "trouble remembering things sometimes," whether the details were "[h]ard to remember," whether she liked "to make up stories," and whether inconsistencies in her testimony resulted from her lack of memory.

¶26    In closing argument, the prosecutor asked the jurors to consider the difficulties the child, seven years old at trial, would have answering questions about being sexually abused:

---

(…continued)
circumstantial evidence; therefore, direct, in-court identification is not required." *Id.* "[A] witness need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime." *Id.* (alteration in original).

> I would ask that you put yourself in her little shoes and think of how you would describe the offenses that occurred to you, how you would be able to help others understand what you experienced, where you were when it happened, where it happened. Why are these people continuing to ask me these questions? Why do I have to talk about things that make me feel uncomfortable? Put yourself in her shoes and use your own adult logic to think about when you were her age and how much ability you had, cognitively, to express yourself. . . . I won't suggest to you that this is an easy process because it's not and the evidence is challenging, but I would, again, urge you to look at this through [the child]'s eyes and walk in her shoes. Try to figure out whether or not [the child] was intentionally trying to lie to you, really, about anything of significance.

¶27 "To determine whether a prosecutor's remarks are 'so objectionable as to merit a reversal,' we must determine whether the remarks 'call to the attention of the jurors matters which they would not be justified in considering in determining their verdict.'" *State v. Campos*, 2013 UT App 213, ¶ 50, 309 P.3d 1160 (quoting *State v. Valdez*, 513 P.2d 422, 426 (Utah 1973)). While "[c]ounsel for both sides have considerable latitude in their arguments to the jury," *Valdez*, 513 P.2d at 426, a prosecutor "exceed[s] the bounds of propriety" by "unfairly appeal[ing] to the sympathies," "passions[,] and prejudices of the jury," *State v. Todd*, 2007 UT App 349, ¶¶ 19–20, 173 P.3d 170 (citation and internal quotation marks omitted). "[T]he determination of guilt must *not* be the product of fear or vengeance but rather intellectually compelled after a disinterested, impartial and fair assessment of the testimony that has been presented." *Id.* ¶ 21 (citation and internal quotation marks omitted). Arguments designed to appeal to passion or prejudice inappropriately "divert the jury from its duty to decide the case on the evidence." *Id.* ¶ 18 (citation and internal quotation marks

omitted). "The jury's guilty verdict must be based on an impartial determination that the State proved each element of the charged crimes beyond a reasonable doubt." *Campos*, 2013 UT App 213, ¶ 53. Appeals to the "passions of the jury [or] the jury's duty to society," may constitute prosecutorial misconduct. *Id.*

## A.    Plain Error

¶28    Isom did not preserve his prosecutorial-misconduct claim at trial. "Generally, where a defendant has not preserved a prosecutorial misconduct claim, appellate review is limited to a determination of whether it was plain error for the trial court not to have intervened." *State v. Redcap*, 2014 UT App 10, ¶ 34, 318 P.3d 1202. To demonstrate plain error, a defendant must establish that (1) the trial court committed error, (2) the error should have been obvious to the court, and (3) the error prejudiced the defendant. *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). "To establish that an error should have been obvious to the trial court, [an appellant] must show that the law governing the error was clear at the time the alleged error was made." *State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276 (citing *State v. Eldredge*, 773 P.2d 29, 35–36 (Utah 1989)). Thus, an obvious error is one that contravenes "settled appellate law," *Ross*, 951 P.2d at 239, or "the plain language of the relevant statute," *State v. Low*, 2008 UT 58, ¶ 41, 192 P.3d 867. An error is prejudicial if "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *Dunn*, 850 P.2d at 1208–09.

¶29    We have been "hesitant to set a rule which would require a trial judge to intervene in closing argument whenever the judge believes a misstatement of the evidence . . . has occurred." *State v. Palmer*, 860 P.2d 339, 344 (Utah Ct. App. 1993). Because the "line which separates acceptable from improper advocacy is often difficult to draw," *State v. Hopkins*, 782 P.2d 475, 480 (Utah 1989), obvious error exists only if the law was "sufficiently clear or plainly settled," *Dean*, 2004 UT 63, ¶ 18, and "the prosecutor's

comments were so obviously improper that the trial court had an opportunity to address the error," *State v. Calliham*, 2002 UT 86, ¶ 62, 55 P.3d 573.

¶30   We do not agree with Isom that settled appellate law required the trial court to intervene in the prosecutor's closing argument. At first blush the prosecutor's remarks do appear to fall squarely within the proscription against inviting jurors to step into the shoes of the victim or the victim's family members. After all, the prosecutor invited jurors to "look . . . through the child's eyes and walk in her shoes." But Isom's appellate challenge ignores the distinction between a victim and a witness. True, the child appeared at trial in the dual roles of victim and witness, but the prosecutor's argument addressed the child primarily as a witness. In light of the child's obvious difficulty in testifying publicly, the prosecutor urged the jurors to "[t]ry to figure out whether or not [the child] was intentionally trying to lie to you, really, about anything of significance."

¶31   We are not persuaded that the challenged statement called the jurors' attention to matters which they were not justified in considering when reaching their verdict. *See Todd*, 2007 UT App 349, ¶ 21. The prosecutor's argument did not invite jurors to "find [Isom] guilty out of vengeance or sympathy for the victim," *see Campos*, 2013 UT App 213, ¶ 52, or otherwise abdicate their position of neutrality. Rather, it invited them to assess the child's credibility as a witness in light of her age. Accordingly, "the invitation [was] not an improper appeal to the jury to base its decision on sympathy for the victim but rather a means of asking the jury to reconstruct the situation in order to decide whether a witness'[s] testimony is plausible." *See United States v. Kirvan*, 997 F.2d 963, 964 (1st Cir. 1993).

¶32   In addition, even if the trial court erred by not sua sponte intervening, the error was not obvious. *See Dunn*, 850 P.2d at 1208–09. As we noted above, the prosecutor's statements were not "so obviously improper" as to rise to the level of reversible prosecutorial misconduct. *See State v. Larsen*, 2005 UT App 201,

¶ 5, 113 P.3d 998 (quoting *Calliham*, 2002 UT 86, ¶ 62). Thus, even if in this case the prosecutor's statement ran afoul of *Campos*, any error the court committed in declining to sua sponte intervene would not have been obvious. *See Dunn*, 850 P.2d at 1208–09.

¶33   In sum, any impropriety in the prosecutor's comments was not so obvious as to require the trial court to intervene. Accordingly, Isom has not established plain error.

B.      Ineffective Assistance of Counsel

¶34   In the alternative, Isom argues that his trial counsel rendered constitutionally ineffective assistance by failing to object to the prosecutor's statements. We review ineffective-assistance-of-counsel claims raised for the first time on appeal for correctness. *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841.

¶35   To succeed on an ineffective-assistance-of-counsel claim, an appellant must show that (1) "counsel's performance was deficient in that it 'fell below an objective standard of reasonableness'" and (2) "counsel's performance was prejudicial in that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Menzies v. Galetka*, 2006 UT 81, ¶ 87, 150 P.3d 480 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). An appellant must rebut "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). Therefore, any ambiguities or deficiencies in the appellate record "simply will be construed in favor of a finding that counsel performed effectively." *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. "[P]roof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *Allen v. Friel*, 2008 UT 56, ¶ 21, 194 P.3d 903 (alteration in original) (citation and internal quotation marks omitted).

¶36 Isom has failed to establish ineffective assistance of counsel. First, as we noted above, the prosecutor's closing statement did not constitute obvious misconduct. Accordingly, whether an objection would have been sustained remains speculative. "Failure to raise futile objections does not constitute ineffective assistance of counsel." *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546.

¶37 Second, even if the prosecutor's closing statement had impermissibly appealed to the "passions of the jury [or] the jury's duty to society," *State v. Campos*, 2013 UT App 213, ¶ 53, 309 P.3d 1160, conceivable strategic reasons supported trial counsel's decision not to object. Given the "strong presumption of competence, we need not come to a conclusion that counsel, in fact, had a specific strategy in mind." *State v. Tennyson*, 850 P.2d 461, 468 (Utah Ct. App. 1993) (citing *Strickland*, 466 U.S. at 689). "Instead we need only articulate some plausible strategic explanation for counsel's behavior." *Id.*

¶38 In *State v. Haga*, we identified several legitimate, strategic reasons for trial counsel not objecting to an improper closing argument. 954 P.2d 1284, 1289 (Utah Ct. App. 1998). First, trial counsel could reasonably have believed that objecting would call attention to the improper statements and suggest to the jury that "they were damaging when counsel felt they were not." *Id.* Second, trial counsel might also have sensed that "the jury was weary and inattentive to the prosecutor and that objecting would only serve to focus their attention on [the] remark[]." *Id.* Finally, trial counsel's decision not to object could have been motivated by concern that an objection would create "antipathy to the defense if the jury perceived that counsel's repeated objections were only prolonging the proceedings." *Id.* And many other strategic reasons may support trial counsel's decision not to object to the prosecutor's closing argument. *See, e.g.*, *State v. Winward*, 941 P.2d 627, 635–36 (Utah Ct. App. 1997) (approving counsel's tactical decision not to object to improper closing argument to avoid suggesting that counsel was "hiding something from the jury"); *West Valley City v. Rislow*, 736 P.2d

637, 638 (Utah Ct. App. 1987) (holding that even though some of the prosecutor's closing argument was "improper," trial counsel could still decide not to object to avoid "emphasiz[ing] the negative aspects of the case to the jury").

¶39   Here, Isom's trial counsel could have had similar concerns. Reasonable counsel might have worried that an objection would backfire, resulting in no curative instruction while making the defense appear unsympathetic to a sympathetic witness. Furthermore, reasonable trial counsel could have recognized that, despite the prosecutor's unfortunate phrasing, in effect the prosecutor merely invited the jury to weigh the child's credibility in light of the actual circumstances of her report of the abuse.

¶40   In sum, Isom has not established deficient performance of his trial counsel and thus his ineffective-assistance-of-counsel claim fails.

## IV. Confrontation Clause

### A.   The Whiteboard Barrier

¶41   Isom contends that "the placement of a white board barricade between [the child] and . . . Isom in the courtroom in plain view of the jury . . . violated . . . [his] right of confrontation."[3] In particular, Isom argues that "[p]lacing a white board . . . between him and [the child] deprived him of the right to confront [the child] and unduly suggested [that Isom] was dangerous and compromised the safety of the witness." The State responds that Isom "demonstrates no error in the use of the whiteboard, because the right to face-to-face confrontation can

---

3. Isom asserts that the whiteboard barrier violated his federal and state constitutional rights to confrontation. But because Isom presents no independent state constitutional analysis, we address only his federal constitutional claim. *See State v. Martinez*, 2013 UT 23, ¶ 18 n.3, 304 P.3d 54.

be abridged even absent a defendant's misbehavior." The State further argues that even if the trial court erred in placing the whiteboard barrier between the child and Isom, any error was harmless beyond a reasonable doubt.

¶42   "Whether testimony was admitted in violation of a defendant's right to confrontation is a question of law, which we review for correctness." *State v. Calliham*, 2002 UT 86, ¶ 42, 55 P.3d 573.

¶43   On direct examination, the child initially refused to testify about Isom's abuse. When asked to explain who else lived with her mother, the child responded, "I forgot" and "I don't know." The child testified that she knew Isom and acknowledged that something had happened that made her feel "bad" about him. But when asked why she felt bad about Isom, she responded that she "forgot." When the prosecutor sought details, the child repeatedly said, "I forgot." The child acknowledged that she had spoken with the prosecutor before the trial about what had happened at her mother's house, but she refused to testify about what happened, stating that the events were hard to talk about. When asked if she would try to discuss what had happened, she responded, "No."

¶44   After the child repeatedly stated that she did not remember and would not discuss the abuse, the prosecutor requested a recess. The court met in chambers with Isom, his trial counsel, and the prosecutor. The court later made a record of the discussion, noting that the prosecutor had asked to place a "rolling white board" between the child and Isom. The prosecutor argued that the child was "having difficulties talking about intimate details and the view of [Isom] is complicating that." The court agreed to placing the whiteboard barrier between Isom and the child "to see if it [was] possible to elicit testimony from the child under those circumstances."

¶45   Trial counsel objected, arguing that because Isom was not acting inappropriately, placing the barrier would violate his

"right to confront his witness." Trial counsel also argued that placing the barrier might induce the jurors to draw an adverse inference against Isom.

¶46 The trial court agreed that Isom had "maintained absolute decorum" during the trial. The court nevertheless overruled trial counsel's objection and ordered the barrier placed between the child and Isom so as not to block the court's or trial counsel's views of either the child or Isom. After returning to the courtroom, the trial court explained to the jury that with "child witnesses, sometimes, sensitivities require the [c]ourt to exercise some discretion in moving things around." The trial court then instructed the jury not to "draw any adverse inference for the [c]ourt's exercise of its housekeeping powers."

¶47 Even with the whiteboard barrier in place, the child did not testify with any specificity about the abuse. As before, when the prosecutor asked the child whether Isom had done anything "bad" to her, she responded, "I forgot" and, "I don't remember." The child also testified that she forgot telling her father about the abuse. She claimed not to know why she was testifying and not to remember discussing her testimony with her father or the prosecutor. The child never did testify in court concerning the abuse.

¶48 The Confrontation Clause guarantees a criminal defendant's right to confront the prosecution's witnesses:

> In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .

U.S. Const. amend. VI. The Confrontation Clause generally guarantees the right to a face-to-face confrontation with adverse witnesses. *E.g.*, *Crawford v. Washington*, 541 U.S. 36, 59 (2004). However, if "the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying . . . is sufficiently important to justify the use of a special procedure that permits a child witness . . . to testify . . . in

the absence of face-to-face confrontation." *Maryland v. Craig*, 497 U.S. 836, 855 (1990). "If an error does occur, we must determine whether . . . the error was nonetheless 'harmless beyond a reasonable doubt.'" *State v. Chavez*, 2002 UT App 9, ¶ 17, 41 P.3d 1137 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

¶49 Assuming without deciding that the trial court erred in placing the whiteboard barrier between the child and Isom, we conclude that any error was harmless beyond a reasonable doubt. "When assessing an error's harmfulness, we look, in part, to 'the overall strength of the State's case': '[t]he more evidence supporting the verdict, the less likely there was harmful error.'" *State v. Benson*, 2014 UT App 92, ¶ 30, 325 P.3d 855 (alteration in original) (quoting *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992)).

¶50 Here, because the child's testimony—even with the whiteboard barrier in place—"was entirely favorable" to Isom, "the error was harmless." *In re P.G.*, 2015 UT App 14, ¶ 18, 343 P.3d 297. After the trial court placed the whiteboard barrier between the child and Isom, the child did not incriminate Isom. The child did not acknowledge the abuse or discuss any details of the abuse, and repeatedly answered the prosecutor's questions by saying, "I forgot" and, "I don't remember." In short, the child testified both with and without the barrier in place that she did not remember anything about the abuse.

¶51 Furthermore, other admissible evidence established Isom's guilt. In the video of the child's CJC interview and in her testimony later via closed-circuit television, the child described the abuse in detail. Trial counsel fully cross-examined the child about her trial testimony and her CJC interview. And Isom's friend testified that Isom admitted to abusing the child.

¶52 Finally, to the extent that the whiteboard barrier may have induced the jury to draw negative inferences about Isom, the trial court addressed this concern by instructing the jury "to

draw no adverse inference to either party from this re-arrangement of the furniture."

¶53    In sum, any possible error was harmless beyond a reasonable doubt. The child's testimony behind the barrier did not incriminate Isom, sufficient alternative evidence supported Isom's convictions, and the trial court instructed the jury not to draw adverse inferences from the presence of the whiteboard barrier. Accordingly, Isom's constitutional claim fails.

B.     The Closed-Circuit-Television Testimony

¶54    Isom also contends that the child's testimony via closed circuit television (CCTV) violated rule 15.5(b) of the Utah Rules of Criminal Procedure in two respects: (1) the State failed "to establish and the court [failed] to find [that] the use of CCTV was necessary," and (2) the presence of the child's father's girlfriend in the interview room, with whom the child interacted throughout her CCTV testimony, risked "the malevolent coaching of a child witness."

¶55    After placement of the whiteboard barrier failed to elicit the child's testimony, the prosecutor suggested that the child testify by CCTV. The court ordered a recess to set up the necessary technology. When proceedings resumed, the child, the prosecutor, trial counsel, and the child's father's girlfriend—whom the child referred to as "Mom"—assembled in an interview room where the child's testimony was broadcast to the jury through CCTV.

¶56    The trial court explained to the jury "that the presence of the witness in the open court was, perhaps, too intimidating for the young lady to continue on with her testimony." The prosecutor reminded the trial court that rule 15.5(b) of the Utah Rules of Criminal Procedure required the court to advise the child "that [Isom] is present in the [c]ourtroom and can listen to the testimony." The trial court told the child that Isom "is in the courtroom with me." The child initially remained reluctant to discuss the details of the abuse. When the prosecutor asked the

child why it was hard for her to testify, she responded, "Is [Isom] watching me?" The prosecutor told the child that Isom was in the courtroom. "Watching me?" she asked. The trial court stated, "[T]he record will reflect that [Isom] is watching." The child's father's girlfriend told the child, "It's okay. You'll be all right, sweetie. Just answer the questions, okay?" The child then described multiple instances of abuse in detail.

¶57    Isom first contends that the child's CCTV testimony violated rule 15.5(b) of the Utah Rules of Criminal Procedure on the ground that the State failed "to establish and the court [failed] to find [that] the use of CCTV was necessary." The State responds that Isom did not preserve his claim and does not assert on appeal any exception to the preservation requirement.

¶58    Rule 15.5(b) of the Utah Rules of Criminal Procedure governs the use of CCTV testimony:

> In a criminal case concerning a charge of child abuse or of a sexual offense against a child, the court, upon motion of a party and for good cause shown, may order that the testimony of any victim or other witness younger than 14 years of age be taken in a room other than the court room, and be televised by closed circuit equipment to be viewed by the jury in the court room.

Utah R. Crim. P. 15.5(b). This rule requires the State "to provide proof that testifying in [d]efendant's presence would cause the child witnesses to suffer emotional or mental strain or cause them to be unreliable witnesses." *State v. Bhag Singh*, 2011 UT App 396, ¶ 12, 267 P.3d 281. Isom argues that because "[n]o such proof [of emotional or mental strain] was presented, and no findings were made by the trial court," the trial court erred in permitting the child to testify by CCTV.

¶59    "[T]o preserve an issue for appeal, the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat*,

*Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). Among other things, this standard requires that the issue be "specifically raised." *See id.* (citation and internal quotation marks omitted).

¶60    Isom did not preserve his rule 15.5(b) claim. Isom argues that he preserved this claim when he objected to the whiteboard barrier. But if a party "makes an objection at trial based on one ground, this objection does not preserve for appeal any alterative grounds for objection." *State v. Low*, 2008 UT 58, ¶ 17, 192 P.3d 867. In *In re P.G.*, we considered whether "the juvenile court could only allow [the child] to testify from the child witness room if it first made a formal finding of necessity." 2015 UT App 14, ¶ 17, 343 P.3d 297. We concluded that the defendant there did not preserve his claim, because "although the juvenile court did not make a finding of necessity before it allowed [the child] to testify from the child witness room, [the defendant] did not object to the room's use on that basis." *Id.* This precedent governs here. Although Isom objected to the placement of the whiteboard barrier, he did not object to allowing the child to testify by CCTV. *Id.*; *see also Low*, 2008 UT 58, ¶ 17; *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 ("Generally speaking, a timely and specific objection must be made [at trial] in order to preserve an issue for appeal." (alteration in original) (citation and internal quotation marks omitted)). And Isom does not claim the benefit of any exception to the preservation rule. Accordingly, we do not reach the merits of this claim.

¶61    Isom next contends that the trial court erred in allowing the child's father's girlfriend to sit with the child during her CCTV testimony, because "no evidence shows [the girlfriend] was a therapist or counselor." The State again responds that Isom did not preserve his claim and on appeal asserts no exception to the preservation rule.

¶62    Rule 15.5(b) of the Utah Rules of Criminal Procedure imposes mandatory conditions on the use of CCTV testimony. It

requires that "[a]ll of the following conditions shall be observed":

> Only the judge, attorneys for each party and the testifying child (if any), persons necessary to operate equipment, and a counselor or therapist whose presence contributes to the welfare and emotional well-being of the child may be in the room during the child's testimony.

Utah R. Crim. P. 15.5(b)(1). Isom argues that because the child's father's girlfriend was neither a "person[] necessary to operate equipment" nor "a counselor or therapist," the trial court erred in permitting the child's father's girlfriend to sit, and interact, with the child throughout the CCTV testimony.

¶63    This claim fails for the same reason that Isom's first rule 15.5(b) claim failed: Isom did not preserve it. Isom again contends that his trial counsel's objection to the use of the whiteboard barrier preserved this CCTV claim. But as noted, "if a party makes an objection at trial based on one ground, this objection does not preserve for appeal any alternative grounds for objection." *Low*, 2008 UT 58, ¶ 17. And Isom does not claim the benefit of any exception to the preservation rule. *See Winfield*, 2006 UT 4, ¶ 14. Accordingly, we do not reach the merits of this claim.

## V. Leading Questions

¶64    Isom contends that "the trial court abused its discretion by permitting the prosecutor to excessively use leading questions." He argues that the prosecutor's "unfettered leading questions" were "excessive, and created evidence due to their excessive suggestive nature and the prosecutor's repeated affirmation of desired testimony." The State responds that "[g]iven [the child]'s age and her demonstrated difficulty in relating the sensitive and embarrassing details of her abuse, [Isom] has not shown that the trial court abused its discretion in allowing leading questions."

¶65 A leading question suggests its answer. "The vice in a leading question is that it in effect puts words in the witness's mouth so the testimony is really that of the questioner and not the witness." *State v. Ward*, 347 P.2d 865, 867 (Utah 1959). "This usually occurs in so framing a question that it assumes a fact to be true, or in reciting a fact and merely seeking affirmation from the witness, or in so phrasing the question as to suggest the desired answer." *Id.* "Questions calling for a 'yes' or 'no' answer are not leading unless they are unduly suggestive under the circumstances." *People v. Pearson*, 297 P.3d 793, 825 (Cal. 2013).

¶66 "The allowance or exclusion of leading questions is within the discretion of the trial court. A ruling on the use of leading questions will therefore be overruled only if the trial court has abused its discretion." *State v. Ireland*, 773 P.2d 1375, 1377 (Utah 1989). Rule 611(c) of the Utah Rules of Evidence governs the circumstances under which the trial court should allow leading questions:

> Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:
>
> > (1) on cross-examination, and
> > (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

Utah. R. Evid. 611(c).

¶67 "Leading questions may be necessary to develop the testimony of a child, especially one who is testifying about a sensitive and embarrassing subject." *State v. Kallin*, 877 P.2d 138, 144 (Utah 1994). Nevertheless, because leading questions may inadvertently or intentionally shape the witness's testimony to conform to the questioner's version of the facts, trial judges

should "exercise tight control over the use of leading questions." *Id.*

¶68    In *State v. Kallin*, our supreme court held that the prosecutor appropriately used leading questions to develop the victim's testimony. 877 P.2d 138, 144 (Utah 1994). There, the eleven-year-old victim had trouble testifying; "she was in tears for most of the direct as well as cross-examination." *Id.* Eventually, an abuse coordinator sat with her. *Id.* The trial judge "did not give the prosecutor license to testify for the witness. The prosecutor did not describe the alleged rape by leading questions, and although some of the questions asked were suggestive, the witness described the events in her own words." *Id.*

¶69    *State v. Ireland* provides another example of the appropriate use of leading questions with a child-sexual-abuse victim. 773 P.2d 1375 (Utah 1989).

> In light of the victim's use of dolls to demonstrate that defendant had sodomized him, the prosecutor's careful use of leading questions, and the trial court's considered opinion that leading questions were necessary to develop the victim's testimony, we do not believe that the allowance of leading questions was error.

*Id.* at 1377.

¶70    Isom argues that "[t]he prosecutor intentionally shaped and created evidence that conformed to the [S]tate's version of the facts with repeated, highly suggestive leading questions to the child until [the] desired responses were obtained." He argues that "[n]o evidence shows the child was distraught or distressed" and that the prosecutor led the child "with respect to where they lived, who lived in the house, which rooms were involved, and all aspects of the events." Isom characterizes the direct examination as involving "questions provid[ing] expected answers regarding every aspect of the abuse: touching, private,

with clothes 'on' or 'off,' lying down, inside, outside." He asserts that "[i]t took the prosecutor two separate rounds of leading questioning to establish that [Isom] had abused [the child] with his hand or digits when the first attempt did not implicate abusive touching." Finally, Isom asserts that "[l]eading questions were repeated, sometimes multiple times, whenever [the child] gave an unwanted answer, until a desired response was elicited. [The child] never answered with more than a few words, and never in her own words."

¶71    We agree that the examination Isom describes would cross the line into impermissible leading questioning. But his description bears little resemblance to the examination contained in the record.

¶72    Like the abuse victims in *Kallin* and *Ireland*, the child struggled to testify about the details of her abuse. Before and after placement of the whiteboard barrier, the child repeatedly stated that she did not want to talk, or even try to talk, about the abuse and responded to questions about it by answering, "I don't remember" and, "I forgot." The prosecutor properly used leading questions to set the stage for discussing the child's abuse. But the child described the abuse in response to nonleading questions. The child first acknowledged the abuse in response to the prosecutor's question, "Do you remember anybody touching you in a way that you didn't like?" The child responded, "My private." The prosecutor continued, "Who touched you on your private?" The child responded, "Jace." The prosecutor continued with more nonleading questions:

> Prosecutor: "One time or more than one time?"
>
> Child: "More."
>
> Prosecutor: "More than two times or just two times?"
>
> Child: "More than two times."

> Prosecutor: "Where were you when he touched you?"

> Child: "At his house."

> Prosecutor: "In what room?"

> Child: "Living room."

The prosecutor then explored the nature of the abuse with more nonleading questions:

> Prosecutor: "How did Jace touch you? What part of his body touched you? Did his nose touch you?"[4]

> Child: "No."

> Prosecutor: "No? What part of his body was touching you?"

> Child: "His private."

> Prosecutor: "His private was touching your private?"

> Child: "Yes."

¶73    After more foundational questions (all nonleading), the prosecutor further explored the details of the abuse:

> Prosecutor: "When he was touching your private with his private, were your clothes on, off or some other way?"

---

4. This is a leading question. But Isom was not convicted of touching the child with his nose.

Child: "Off."

Prosecutor: "Okay. How did your clothes get off? Do you remember? Did you take your clothes off or did someone else take your clothes off or how did that happen?"

Child: "He took them off."

Prosecutor: "Jace did? Was that yes? Can you say yes?"

Child: "Yes."

Isom describes this exchange as the prosecutor "direct[ing] [the child] to say yes." In fact, the prosecutor was simply ensuring that the child's answer was clear and audible, as demonstrated by the next question: "Okay. Say yes in this microphone so we can record it, okay?" Thus, the prosecutor instructed the child to answer "yes" not to lead her, but to ensure that her original nonverbal response would be captured on record.

¶74    The child gave further detail of the abuse in response to the prosecutor's nonleading questions such as these: "On the bed, okay, and were you sitting or standing or lying or what were you doing?" "Were your clothes on or off?" "Okay, how did they get off?" "After he told you to take your clothes off, then, what would happen?" "Did he touch you with any other part of his body?" "Where were his hands when he was touching you with his private?" And so on.

¶75    We are baffled at how Isom could describe this examination as consisting of a series of "leading, suggestive, yes-or-no questions" or could conclude that the child never answered in her own words. We hold that the prosecutor used leading and nonleading questions properly. Indeed, he elicited the facts of the charged offenses almost exclusively with

nonleading questions. *See State v. Kallin*, 877 P.2d 138, 144 (Utah 1994); *State v. Ward*, 347 P.2d 865, 867 (Utah 1959). We discern no error here.

## VI. Character Evidence

¶76    Isom contends that his trial counsel was constitutionally ineffective for failing to object under rule 404(b) of the Utah Rules of Evidence to Isom's friend's testimony about Isom's drug use; to Isom's interest in sexual "threesomes" and bestiality; to Isom's supposed urination fetish; and to the child's mother's participation in bestiality.[5] In the alternative, Isom contends that the trial court plainly erred by not excluding this evidence sua sponte under rule 404(b).

¶77    At trial, Isom's friend testified—without objection from trial counsel or intervention by the trial court—to Isom's drug use; to his interest in sexual "threesomes" and bestiality; to his supposed urination fetish; and to the child's mother's participation in bestiality. Isom's friend testified that these admissions occurred during the same conversation in which Isom admitted that he and the child's mother had sexually abused the child. Isom's friend testified that he and Isom had been "good friends" and "drug addicts." Isom's friend stated that he and Isom had "smoked some spice" at the time Isom admitted to him that Isom and the child's mother had abused the child.

¶78    Isom's friend testified that during this conversation, Isom invited him to participate in a sexual threesome with Isom and the child's mother, something Isom's friend had done with Isom and Isom's prior girlfriend. Isom's friend testified that while he

---

5. "A person commits the crime of bestiality if the actor engages in any sexual activity with an animal with the intent of sexual gratification of the actor." Utah Code Ann. § 76-9-301.8(1) (LexisNexis 2012).

and Isom discussed the offer, Isom showed his friend digital "pictures" and "clips" of the child's mother having sex with a dog. Finally, Isom's friend testified that Isom told him about one occasion when Isom was having sex with the child's mother while the child was "on top of him as well." Isom said, according to his friend, that the child "[t]old her mommy that [Isom] peed on her" during this sexual encounter with the child's mother. Isom's friend testified that he understood Isom to mean that Isom had ejaculated on the child.

¶79   Rule 404(b) sets forth the limitations on the use of evidence of crimes, wrongs, and other-acts evidence:

> (1) Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character.
> (2) This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Utah R. Evid. 404(b).

A.   Ineffective Assistance of Counsel

¶80   Isom contends that his trial counsel was constitutionally ineffective for "failing [to] object to the State introducing character evidence regarding use of drugs, interest in adult sexual threesomes and bestiality, . . . a possible urination fetish," and evidence that the child's mother "had engaged in sex with a dog." The State responds that Isom has not shown that his trial counsel was deficient in not objecting to the testimony and that "[e]vidence of 'a supposed urination fetish' is misinterpreted and relates to the charged crimes, not other acts." We review ineffective-assistance-of-counsel claims raised for the first time on appeal for correctness. *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841.

¶81    To succeed on an ineffective-assistance-of-counsel claim, an appellant must show (1) that "counsel's performance was deficient in that it 'fell below an objective standard of reasonableness'" and (2) that "counsel's performance was prejudicial in that 'there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Menzies v. Galetka*, 2006 UT 81, ¶ 87, 150 P.3d 480 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984)). An appellant must rebut "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). Therefore, any ambiguities or deficiencies in the appellate record "simply will be construed in favor of a finding that counsel performed effectively." *State v. Litherland*, 2000 UT 76, ¶ 17, 12 P.3d 92. "[P]roof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality." *Allen v. Friel*, 2008 UT 56, ¶ 21, 194 P.3d 903 (alteration in original) (citation and internal quotation marks omitted).

¶82    We conclude that trial counsel's decision not to object to Isom's friend's testimony about sexual "threesomes" and bestiality was supported by a reasonable trial strategy: to impeach Isom's friend. Isom's friend testified that Isom had admitted to him that Isom had abused the child. Trial counsel's strategy was to impeach the friend with friend's additional, more far-fetched claims. After allowing the jury to hear all of the details of Isom's friend's testimony, trial counsel called Isom and the child's mother to testify. Both denied engaging in sexual "threesomes," bestiality, and child sex abuse. Trial counsel then argued that Isom's friend's testimony was so "shocking" and "outrageous" that it could not be believed. Trial counsel emphasized that the prosecutor was "relying on" and putting "most of his faith" in Isom's friend's testimony. Trial counsel asked the jury to consider Isom's friend's testimony about child's mother "and animals and those type of things, and if you think

that that's not true, then you can disregard the rest of his testimony."

¶83 Trial counsel's decision not to object to Isom's friend's testimony about Isom's drug use also may have been a legitimate exercise of professional judgment. Isom's friend was a convicted drug addict, a fact that trial counsel used to further undermine his credibility. Isom's friend testified that he and Isom had been "good friends" and "drug addicts." He testified that he and Isom had "smoked some spice" at Isom's home on the day Isom revealed the abuse to his friend. In closing, trial counsel emphasized that Isom's friend "was high" during his conversation with Isom and that, because he "was high," Isom's friend took what Isom had told him and "blew it up" into an unbelievable story. Trial counsel thus could reasonably have concluded that objecting to Isom's friend's description of his and Isom's shared drug use would undermine the strategy of impeaching Isom's friend's salacious testimony as the product of his drug use. Furthermore, Isom admitted to past drug use when he testified.

¶84 Finally, trial counsel's decision not to object to Isom's friend's testimony about Isom's "supposed urination fetish" does not establish deficient performance. Isom's friend explained at trial that what Isom now describes as a reference to a "supposed urination fetish" was in fact a reference to Isom's having ejaculated during the sexual abuse of the child. In any event, this testimony related to the crimes charged, not to other acts, regardless of whether Isom's statement was referring to ejaculation or urination. Rule 404(b) "applies only to evidence that is *extrinsic* to the crimes charged." *Lucero*, 2014 UT 15, ¶ 14 n.7 (citation and internal quotation marks omitted). Thus, whether referring to ejaculation or urination, Isom's statement to his friend could reasonably be read not as a reference to an "other act," but to the very act charged.

¶85 In sum, we conclude that trial counsel's decision not to object to the challenged testimony "falls within the wide range

of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). Isom's ineffective-assistance-of-counsel claim accordingly fails.

## B.    Plain Error

¶86    Isom contends that the trial court plainly erred in admitting the challenged evidence in violation of rule 404(b) of the Utah Rules of Evidence. The State responds that Isom "has not shown that the trial court erred, let alone plainly erred, in not sua sponte striking the testimony."

¶87    To demonstrate plain error, a defendant must establish that (1) the trial court committed error, (2) the error should have been obvious to the court, and (3) the error is harmful. *State v. Dunn*, 850 P.2d 1201, 1208–09 (Utah 1993). To establish that an error should have been obvious to the trial court, an appellant "must show that the law governing the error was clear at the time the alleged error was made." *State v. Dean*, 2004 UT 63, ¶ 16, 95 P.3d 276 (citing *State v. Eldredge*, 773 P.2d 29, 35–36 (Utah 1989)). Thus, an obvious error is one that contravenes "settled appellate law," *Ross*, 951 P.2d at 239, or "the plain language of the relevant statute," *State v. Low*, 2008 UT 58, ¶ 41, 192 P.3d 867. An error is prejudicial if "absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant, or phrased differently, our confidence in the verdict is undermined." *Dunn*, 850 P.2d at 1208–09.

¶88    Furthermore, a trial court is "not required to constantly survey or second-guess [a] nonobjecting party's best interests or trial strategy and is not expected to intervene in the proceedings unless the evidence would serve no conceivable strategic purpose." *State v. Bedell*, 2014 UT 1, ¶ 26, 322 P.3d 697 (alteration in original) (citation and internal quotation marks omitted). Consequently, where "defense counsel was not ineffective for failing to object to the State's use of . . . 404(b) evidence, there was no plain error on the part of the district court in not intervening to foreclose the State's use of the evidence." *Id.*

¶89　Under these principles, Isom cannot establish plain error. As noted above, *see supra* ¶¶ 82–83, trial counsel's decision not to object to the testimony Isom now challenges on appeal served conceivable strategic purposes. Consequently, the trial court did not obviously err in admitting it.

¶90　In sum, we conclude that the trial court did not plainly err when it did not intervene sua sponte to prevent the jury from hearing the challenged testimony.

## VII. Cumulative Error Claim

¶91　Finally, Isom cursorily contends that "the cumulative effect of the errors in this case warrants reversal" of his convictions. The State responds that because Isom "has not demonstrated any single error, the cumulative error doctrine is inapplicable."

¶92　Under the cumulative-error doctrine, we "will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (omission in original) (citation and internal quotation marks omitted). Here, Isom has failed to carry his burden of demonstrating error in any of his claims. But even if Isom had demonstrated some error, cumulative-error analysis "cannot be conducted in a vacuum, ignorant of the other evidence demonstrating guilt." *State v. Perea*, 2013 UT 68, ¶ 105, 322 P.3d 624. As we have noted, more than sufficient evidence supported Isom's convictions. Accordingly, Isom's cumulative-error claim fails.

## CONCLUSION

¶93　The judgment of the district court is affirmed.