**2016 UT App 242**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JESUS MARIA ROMERO,
Appellant.

Opinion
No. 20141066-CA
Filed December 15, 2016

Fourth District Court, Provo Department
The Honorable Fred D. Howard
No. 131401244

Aaron P. Dodd, Attorney for Appellant

Sean D. Reyes and Kris C. Leonard, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
GREGORY K. ORME and J. FREDERIC VOROS JR. concurred.

TOOMEY, Judge:

¶1    Defendant Jesus Maria Romero appeals his conviction for sodomy on a child, contending the trial court's admission into evidence of details of a prior conviction was an abuse of discretion that prejudiced him. We agree and remand for a new trial.

BACKGROUND[1]

¶2    In January 2010, the child in question (Child) and her family were visiting Utah from another state. One evening, three-year-old Child and her brother stayed with their grandmother while their parents went out. Romero was also at Grandmother's home during the children's stay. Grandmother prepared dinner for the children, which they ate in the "great room"—a room open to the kitchen and dining areas—while watching a movie. During dinner, Child spilled juice on the front of her pants and "all over the [hardwood] floor." Romero was angry about this and brought a dishtowel from the kitchen to clean up the spill. While Grandmother was on her hands and knees mopping the spill with the dishtowel, Romero took Child to the kitchen to clean her. No one else was in the kitchen, and Grandmother could not see them from her position in the great room. Brother was sitting on a couch, facing away from the kitchen. Child testified that while she and Romero were alone in the kitchen, Romero pulled her underwear "down to [her] feet" and licked her "peepee" with his tongue. Grandmother testified that Romero and Child were in the kitchen between thirty seconds and two minutes.

¶3    When Grandmother finished mopping the spill, she went to the kitchen and met Romero coming down the hallway from the laundry room. Grandmother, Romero, and Child met at the point where the great room, kitchen, and hallway converged. Coco, a small dog belonging to Grandmother, "jumped up on [Child] and tried to sniff her little spot where she had her apple juice." Romero "snapped at [Child] and said, 'Don't let her lick

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Thornton*, 2014 UT App 265, ¶ 2 n.1, 339 P.3d 112 (citation and internal quotation marks omitted).

your peepee.'" The three of them joined Brother in the great room and resumed watching the movie; Romero fell asleep on the couch.

¶4 A few weeks later, Child told her mother about the incident. Two days later, Mother called Grandmother and told her what Child had disclosed to her. Mother told Grandmother to talk to Romero and call back when she was ready. Romero called the next day and confirmed that Child had spilled her juice and he had taken her into the kitchen to clean her. Romero told Mother that he walked to the laundry room and came back to find "the dog . . . licking [Child] in her private area"; "[Child] was kind of giggling and said, 'Hey, look . . . . Coco's licking my peepee.'" Romero encouraged Mother to "call the authorities" to report the allegation against him.

¶5 About a month later, a licensed social worker (Interviewer) conducted a forensic interview with Child and Mother. Mother was interviewed first and told Interviewer "what [Child] had said to [her] and what had happened" and then Child was interviewed. During the interview, Child identified the chest area and genitals as "privates" and when asked if someone had ever touched those parts of her body, she shook her head "no." She also denied talking to Mother about her "privates" and that anything bad had happened to her. But when asked, "Do you know why you came here today?" she responded, "To tell what happened." When asked what had happened, she said Romero "licked my peepee." Interviewer later testified that, to young children, "touching involves fingers or hands" and "licking is a completely different action than touching." But Interviewer conceded that she "wouldn't be able to state that [she knew] that [Child] perceives touching as fingers and not as tongue."

¶6 Two years later, when Child was five years old, a different social worker (Social Worker) conducted a second

forensic interview with Child. In the second interview Child again denied that anyone touched her "[private] parts."

¶7     Social Worker did not testify at trial; rather, Interviewer reviewed the second interview in preparation for trial. Interviewer indicated she had some concerns about the second interview: that Social Worker did not take time to build "rapport" with Child and did not "have any background information on [Child] or the specific allegations," that the interview mainly focused on touching, and that Social Worker seemed unaware of "the cultural issues."[2] Interviewer indicated she did not "consider [the] second interview a recantation of [Child]'s story." Interviewer emphasized that Child said that Romero "looked at her peepee" and that Child was still able to "provide[] quite a bit of detail[]" not provided in the first interview. Mother testified that Child did not want to go to the second interview, that Mother "had to force her pretty much to get in the car," and that Child was crying the "whole way there." Mother also testified that, when they were home, Child told Mother she had lied in the interview with Social Worker because she was scared.

¶8     At trial in March 2014, when Child was seven years old, she testified that she spilled juice on her pants while she and Brother were watching a movie in the great room. She testified that Romero "took [her] into the kitchen" to "clean [her] up." Child stated that Romero pulled her pants down to her feet and

_____

2. Interviewer elaborated on what she meant by using the term "cultural issues." According to Interviewer, Social Worker told Child that she knew children who had two mothers or two fathers and asked Child if she had two fathers. Interviewer stated, "The reason I say that that may have been a cultural issue is because knowing the background of the family, knowing that her family—her parents were not divorced, and that may not be a part of their culture, it was very confusing to her."

"licked me in my private" with his tongue. She indicated that the kitchen and living room areas are the same room, that no one else was present in the kitchen area, and that she could not see Grandmother or Brother when she was in the kitchen with Romero. Child testified that she told Brother, Mother, and her father about the incident, as well as "a lady"—referring to Interviewer. Child also stated she told another person—apparently Social Worker—that "nothing ever happened" because she was scared and "didn't want to tell her."

¶9 Romero also testified at trial. He said that Child spilled her juice and he took her into the kitchen to clean her. He stood her on the counter and "cleaned the front of her up" with some dishtowels. After that, he "walked down the hallway . . . into the laundry room" to put the dishtowels in the laundry. There are differing accounts as to what happened next. Grandmother testified that when Romero came back, he met Grandmother and Child where the hallway converged with the kitchen; Coco was also there and jumped on Child. Grandmother stated that Romero "snapped at [Child] and said, 'Don't let her lick your peepee.'" Romero testified that only he and Child were in this area at the time, that Child said, "Coco was licking my peepee," and that he responded, "Coco did not lick your peepee. Go see your Nana." Romero also indicated there was "a lot of visibility" between the "kitchen counter [and] the great room" and that he was in the kitchen with Child "two or three minutes, maybe, at the most." He denied licking Child.

¶10 On cross-examination, the prosecutor asked Romero, "You have been convicted of a crime of dishonesty in the past, haven't you?" Romero responded, "[Y]es." Prosecutor asked Romero if the "crime was unemployment compensation fraud," and Romero confirmed it was. Finally, Prosecutor asked if it was a third degree felony and if the conviction occurred in April 2003. Romero responded that he did not know it was a felony at the time, that he did not know exactly when he was convicted

but that April 2003 was "probably too far," and that he did not know what month it was.

¶11 On redirect, Romero testified that he pleaded guilty to the unemployment compensation fraud, against the advice of his attorney, because he was guilty of the offense. He stated that he "took responsibility for it," and his attorney was very angry that he admitted responsibility for it.

¶12 The supplemental record indicates that before "[P]rosecutor began his recross, . . . [P]rosecutor asked for counsel to approach the bench."[3] Off the record, Prosecutor "asserted that Romero had opened the door for the State to ask further details about Romero's prior conviction for fraud." The court allowed Prosecutor to "ask questions about the details of Romero's prior conviction" over defense counsel's objection. On recross examination, Prosecutor elicited that Romero took unemployment checks for twenty-three weeks after Romero started working; that Romero had to repay $7,200; and that Romero indicated "more than once" that he was not working when he actually was. Prosecutor then engaged Romero in the following colloquy:

> Q. Okay, so you would be shocked to learn that it was 23 different times that you let compensation fraud know that you were working—I'm sorry, the compensation office know that you were working—or were not working when you actually were [] working?
> A. Is that what it was?

---

3. On appeal, the parties stipulated to supplementing the record under rule 11 of the Utah Rules of Appellate Procedure with a declaration from Romero's trial counsel explaining what transpired during the sidebar, which went unrecorded during trial.

Q. That is what it was. Would that shock you to know that you did it that many times?

A. Yeah, that would be.

Q. Okay.

A. Because, I mean, I'm just—

Q. My next question is, is after you would tell them you weren't working, they would send you a weekly check, correct?

A. That is correct, yes.

Q. And you accepted those checks?

A. And cashed them, yes.

Q. Cashed them and used them for your personal purposes?

A. I wouldn't say personal . . . . Yeah.

Q. Would you be shocked to learn that you told when you were sentenced, the Adult Probation and Parole, that you needed that money to pay for your child support?

A. I'm sorry, [Prosecutor], I never—I never went in front of an Adult Probation person.

Q. Were you ever sentenced on this felony?

A. The only thing I was sentenced, the Judge sentenced me to 45 days of work to—and said that I—gave me 45 days, didn't give me a specific— didn't say I had—

Q. Okay.

A. —to do it in 45 days, but I just did, 45 hours— no, 45 days of work service—

Q. It's your testimony—

A. —for the State.

Q. —it's your testimony today that you did not— you weren't placed on probation for a felony crime?

A. No, sir.

¶13 The court gave the jury a cautionary instruction that it should not consider evidence "that the defendant was previously convicted of a crime" as "evidence that the defendant is guilty of the crime for which he is now on trial." The court instructed that "[t]his evidence was brought to your attention only to help you evaluate the credibility of the defendant as a witness."

¶14 During closing arguments, Prosecutor stated, "This case really comes down to [Child]'s testimony and [Romero]'s testimony. . . . [T]his case is a case of credibility. Who is more credible, the seven-year-old [Child] or the adult, Mr. Romero?" Prosecutor further stated, "You've heard of [Romero]'s prior conviction, that he's been convicted in the past." After reminding the jury of the instruction that the prior conviction evidence could not be used as evidence that Romero was guilty of this crime, Prosecutor stated, "What you can use that evidence for is to judge his credibility . . . . So that's another thing to consider; and I submit to you a huge thing to consider [is] the credibility of his testimony."

¶15 During deliberations, the jury asked one question: "The defendant answered 'no' when asked if he was on probation for his previous felony. Can you verify this (if he was on probation)?" The court responded, "The trial having concluded, no additional evidence may be presented."

¶16 The jury returned a verdict of guilty. Romero was convicted and sentenced to an indeterminate term of twenty-five years to life in prison. Romero appeals.

ISSUE AND STANDARD OF REVIEW

¶17 On appeal, Romero contends "the trial court abused its discretion by allowing the State to question Romero about his

prior conviction."[4] "We review a trial court's evidentiary rulings for an abuse of discretion." *State v. Alzaga*, 2015 UT App 133, ¶ 31, 352 P.3d 107.

ANALYSIS

¶18 Romero contends the trial court abused its discretion by allowing the State to question him about his prior conviction for unemployment fraud and this error so prejudiced him as to merit a new trial. "Evidence of prior convictions may be used to impeach a testifying defendant's credibility as a witness." *State v. Tucker*, 800 P.2d 819, 822 (Utah Ct. App. 1990); *see also* Utah R. Evid. 609(a)(2). Unless a defendant "open[s] the door" by "attempt[ing] to explain away the effect of the conviction or to minimize his guilt," the "inquiry should be limited to the nature of the crime, the date of the conviction and the punishment." *Tucker*, 800 P.2d at 822–23 (citation and internal quotation marks omitted). Because "collateral matters" may "prejudice the jury against the defendant," "[a] prosecutor may not parade the details of the prior crime in front of the jury." *Id.* at 822 (citations and internal quotations marks omitted).

¶19 In *State v. Havatone*, 2008 UT App 133, 183 P.3d 257, the defendant was arrested for forgery pursuant to a warrant. *Id.* ¶¶ 2–3. After transporting the defendant to jail, the arresting officer discovered methamphetamine under one of the seat cushions in the squad car. *Id.* ¶ 2. The defendant admitted to the officer that she had committed forgery but denied ownership of the drugs. *Id.* She was charged with one count of possession of a

---

4. Romero also contends that "Prosecutor committed misconduct during closing arguments" or, "[i]n the alternative, [that] Romero's conviction should be reversed under the cumulative error doctrine." Because our resolution of the prior conviction issue is dispositive, we do not reach Romero's other arguments.

controlled substance. *Id.* ¶ 3. At trial, the court "allowed the information that the arrest warrant was for forgery" and permitted the arresting officer "to testify regarding [the defendant's] statement." *Id.*

¶20 The defendant testified that she pleaded guilty to forgery and "admitted that she had told [the arresting officer] that she had committed a forgery." *Id.* ¶ 4. During cross-examination, the prosecutor "explor[ed] the elements of forgery," including what is required to establish intent and details about how it is committed. *Id.* ¶¶ 4, 14. This court determined that "the trial court abused its discretion by allowing [these] questions" because "[t]he elaboration . . . went well beyond the limited questions allowed [for impeachment], especially where [the defendant] never attempted to explain away her actions or . . . minimize her guilt respecting the forgery." *Id.* ¶¶ 13–14.

¶21 Here, the State admits that Romero "acknowledge[d] that he entered a guilty plea and accepted responsibility for the prior offense [and thus] did 'not open the door to an inquiry into any details' of the prior conviction." (Quoting *id.* ¶ 15.) The State also concedes that under *Havatone* "the trial court should have excluded questioning about the details of [Romero's] prior offense." Nevertheless, the State contends the error was harmless.

¶22 "The test for harmless error in cases involving an erroneous failure to exclude prior convictions is whether, absent the error, there was a reasonable likelihood of a more favorable result for [the] defendant." *State v. Cravens*, 2000 UT App 344, ¶ 13, 15 P.3d 635 (citation and internal quotation marks omitted).

¶23 The State argues that, although only Romero and Child were present when the alleged abuse occurred, "[t]estimony from the State's other adult witnesses and from [Romero] himself corroborated nearly all of [Child]'s other testimony." The State also argues that "[Child]'s explanation of the abuse itself is

entirely credible" because "it describes an event that could have occurred within the short time [Child] and [Romero] were alone in the kitchen, [and] . . . an event to which [Child] had not been previously exposed, according to her mother."

¶24   We are not persuaded. "Although many types of evidence pose a risk of unfair prejudice, conviction evidence, in particular, carries with it unique and inherent danger of unfair prejudice." *Robinson v. Taylor*, 2015 UT 69, ¶ 33, 356 P.3d 1230. The details of the prior conviction that Prosecutor presented in this case go well beyond those held to be improper in *Havatone*. In *Havatone*, the prosecutor outlined the ways forgery can be committed but did not elicit any specific details about what the defendant actually did. *State v. Havatone*, 2008 UT App 133, ¶ 14, 183 P.3d 257. In this case, Prosecutor emphasized that Romero misrepresented his employment status twenty-three times during a period exceeding five months, called attention to the method of misrepresentation and the fact that Romero had to repay $7,200, and questioned whether Romero told Adult Probation and Parole that he "needed that money to pay for . . . child support." During recross-examination, Romero also disclosed that he was sentenced to forty-five days of work service for the felony and denied having been placed on probation. In addition, Prosecutor emphasized Romero's prior conviction in his closing argument, stating, "You've heard evidence that the defendant has reason to lie or slant his testimony. You've heard of his prior conviction . . . . I submit to you [that evidence is] a huge thing to consider on the credibility of his testimony." The State contends that Prosecutor did not emphasize anything inappropriate in his closing argument. Although it is true that Prosecutor did not mention the details of Romero's conviction during closing, putting such an emphasis on the conviction would have conjured for the jury all of the information adduced about the prior conviction throughout the trial.

¶25    And it is clear the jury considered all of this. Although it asked a couple of questions for clarification during trial, it only submitted one question to the court during deliberations: "The defendant answered 'no' when asked if he was on probation for his previous felony. Can you verify this (if he was on probation)?" This question demonstrates that the jury placed weight on Romero's prior conviction, the details of which had been "parade[d] . . . in front of the jury." *See State v. Tucker*, 800 P.2d 819, 822 (Utah Ct. App. 1990); *cf. State v. Jacobs*, 2006 UT App 356, ¶ 12, 144 P.3d 226 ("[T]he jury's inquiry during deliberations concerning whether the term 'touching' required skin contact demonstrates that it was in fact a problematic issue for the jury.").

¶26    In *State v. Emmett*, 839 P.2d 781 (Utah 1992), the defendant appealed his conviction of sodomy upon a five-year-old child. *Id.* at 783. The only direct evidence of the alleged abuse was the victim's testimony, *see id.* at 786; there was "no physical evidence of sexual abuse, nor was any evidence presented that the child was presently exhibiting psychological symptoms of sexual abuse," *id.* at 783. During trial, evidence of the defendant's prior conviction for forgery was admitted, and the prosecutor made improper comments concerning the prior conviction. *Id.* at 785–86 & n.15. In "determining whether these errors [were] harmful," our supreme court observed that "it is important to note that the evidence of sodomy in th[e] case, while sufficient to support a conviction, [was] not compelling. The entire State's case [was] built on the somewhat conflicting and confused testimony of a five-year-old child, uncorroborated by any other direct evidence of guilt." *Id.* at 786; *see also State v. Fowers*, 2011 UT App 383, ¶ 23, 265 P.3d 832 (stating that "[w]ithout the evidence of the prior conviction, the jury might have been more inclined to believe [the defendant]" where "the jury was tasked with resolving a classic credibility contest" and "there [was] no corroborating nontestimonial evidence for either story").

¶27 Here, as in *Emmett*, the case against Romero is not compelling. The State's case "is built on the somewhat conflicting . . . testimony" of a seven-year-old child, relaying an event that allegedly occurred when she was three years old. *See Emmett*, 839 P.2d at 786. There is no physical evidence of abuse or evidence of psychological symptoms consistent with sexual abuse. Child's testimony is the only direct evidence of guilt, and her statements were sometimes inconsistent. In her first forensic interview, when Interviewer asked Child if anyone had ever touched the private areas of her body, Child shook her head "no." Child also told Social Worker that no one had ever touched what Social Worker called her "private parts." Although Child told Mother that she lied during this interview, she gave different statements to different people about whether any abuse occurred. Interviewer attempted to minimize these discrepancies by testifying that young children often interpret touching to "involve[] fingers or hands." "While it cannot be expected that the testimony of a young child should be as coherent as the testimony of an adult, confusion and discrepancies in [her] testimony nonetheless affect the strength of the State's case." *See id.* And the introduction of details of a prior conviction may be more harmful when the evidence against the defendant "is not compelling." *Id.*

¶28 The State argues that because other aspects of Child's testimony were corroborated by Grandmother and by Romero himself, there is still enough evidence to support Romero's conviction. But there is no corroborating testimony on the most salient fact: whether Romero actually perpetrated sodomy upon Child. Rather, as the State acknowledges, because only Romero and Child were in the kitchen at the time of the alleged abuse, "this case is about credibility. . . . It's about [Romero]'s credibility, and [Child]'s credibility." And "[i]n close cases" like this one where the State's case is primarily built upon the "somewhat conflicted" testimony of the alleged victim, "the substantive use of a prior conviction can often tilt the balance in

favor of conviction, particularly . . . where [the defendant's] character is at the heart of his defense." *Id.*

¶29   "If there is a reasonable likelihood that, absent the error, there would have been a more favorable result for the defendant, then his conviction must be reversed." *State v. Iorg*, 801 P.2d 938, 941 (Utah Ct. App. 1990). "An error is prejudicial if 'absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant . . . .'" *State v. Isom*, 2015 UT App 160, ¶ 28, 354 P.3d 791 (quoting *State v. Dunn*, 850 P.2d 1201, 1208 (Utah 1993)). We conclude that in this case, as in *Emmett*, had Prosecutor not emphasized the details of Romero's perpetration of fraud, there is a reasonable likelihood that "there would have been a more favorable result for" Romero. *Iorg*, 801 P.2d at 941. We therefore determine that the admission of the details of Romero's prior conviction was prejudicial.

CONCLUSION

¶30   We conclude that the trial court's admission of the details of Romero's prior conviction was prejudicial. Accordingly, we vacate his conviction and remand the case for a new trial.

——————