2026 UT App 78

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
AARON PAUL CARTWRIGHT,
Appellant.

Opinion
No. 20230748-CA
Filed May 14, 2026

Third District Court, Salt Lake Department
The Honorable Patrick Corum
No. 221911399

Emily Adams, Jessica Holzer, and Freyja Johnson,
Attorneys for Appellant

Derek E. Brown and Christopher A. Bates,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1 A jury convicted Aaron Paul Cartwright of aggravated assault. Cartwright appeals his conviction, arguing that his trial attorney (Counsel) rendered ineffective assistance in three ways: (1) by not asking for a jury instruction on defense of others, (2) by not objecting to various questions the State asked the complaining witness, which questions Cartwright contends were leading questions, and (3) by not asking for admission of some of Cartwright's medical records. Cartwright contends that the first two of these claims can be supported by evidence already in the record, but for the third, Cartwright asks us to remand this case to the trial court for supplementation of the record. For the

reasons that follow, we reject Cartwright's arguments, deny his motion for a remand, and affirm his conviction.

## BACKGROUND[1]

### *The Incident*

¶2    Cartwright and his girlfriend (Girlfriend) lived together in Cartwright's car. One evening, they got high on methamphetamine (meth) and eventually fell asleep. Sometime later, Girlfriend and Cartwright awoke in the middle of the night, and Cartwright "woke up really mad." Girlfriend "tried to get out of the car," and Cartwright "tried to grab [her]" to prevent her from leaving. Eventually, she was able to "open the door, . . . jump[] out of the car and [run] across the street," and Cartwright "came chasing [her] out of the car [in] a rage." He soon caught up to her, and she "started screaming, 'Leave me alone!'" At one point, "some guy [from] across the street . . . came over and handed" Girlfriend a soft drink, and she drank it and "waited a little bit." After a few minutes, she tried to escape Cartwright again, but as she left, he pursued her, and "the chase was on again," with Girlfriend "screaming" and Cartwright telling her that he was "going to kill [her]."

¶3    Cartwright eventually caught up to her again in a nearby parking lot, but by that time Girlfriend had fallen "down on the ground" and was "on [her] back," missing some of her clothing. Cartwright got "on top of [her] and [held her] down" with "[h]is hands . . . on [her] face," "over [her] mouth," and "on [her] neck."

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

Girlfriend "couldn't swallow . . . [or] breathe," and she "[tried] to scream, but . . . couldn't." This continued for "30 seconds to one minute," until law enforcement officers arrived on the scene.

¶4 Officers immediately separated Cartwright and Girlfriend and ordered Cartwright to sit down, which he did. Cartwright was enraged and shouted profanities at the officers, protesting that he had been "the one that was helping" Girlfriend. Officers began putting handcuffs on Cartwright, who looked over at Girlfriend and yelled, "I fucking helped you! . . . This is fucked up, what you're doing to me; I will fucking take you to court! You will go down for this!"

¶5 Then an officer (Officer 1) walked Girlfriend out of Cartwright's sight. Girlfriend was breathing heavily and told Officer 1 that she felt like she was going to "pass out." Officer 1 told her to sit down to catch her breath, which she did, and he called "medical" to come take a look at her. After a few minutes, Girlfriend explained through labored breathing much of the incident recounted above, and she stated that during the incident, she had been unable to breathe. Girlfriend also stated that during the altercation, Cartwright grabbed her throat. Officer 1 then made a "C" shape with his hand and asked if that is how Cartwright grabbed her throat, to which Girlfriend nodded and said, "Yeah." A few minutes later, while still waiting for medical assistance, Girlfriend told Officer 1, "I don't want [Cartwright] to get out, because I don't want him hurting me." And nearly fifteen minutes after officers had arrived on the scene, Girlfriend said, "I can breathe now, so that's better."

¶6 After Cartwright was handcuffed, another officer (Officer 2) placed him in the back of a police car. From there, Cartwright continued to shout profanities at the officers and bang on the vehicle's plexiglass separation barrier. After a few minutes, Cartwright said to Officer 2, in a much gentler tone, "She's going to kill herself. She started screaming and yelling that she's going

to kill herself. You don't care. Oh, ok, I didn't think you did." Then Cartwright reverted to shouting profanities and banging on the barrier. After a few more minutes, Cartwright yelled, "I woke up to [Girlfriend] biting the shit out of me!" And later, when Officer 2 tried to explain to Cartwright why he was in the police car, Cartwright yelled, "Stop making me look like a goddamn criminal and instead have the criminal over there look like the criminal," referring to Girlfriend.[2]

¶7 Officers later took Cartwright to the county jail, where Cartwright told officers, in "a singsong voice," that he had swallowed "balloons of heroin." Cartwright was later taken to a hospital, where Officer 2 observed "scratch marks" on Cartwright's chest and arms. Cartwright was eventually "cleared by doctors" and escorted back to the jail.

*Trial*

¶8 The State charged Cartwright with aggravated assault, which in this case required the State to prove, among other things, that Cartwright had committed an "act that impede[d] the breathing or the circulation of blood of [Girlfriend] by [his] use of unlawful force or violence that [was] likely to produce a loss of consciousness by" either (a) "applying pressure to the neck or throat" or (b) "obstructing the nose, mouth, or airway." *See* Utah Code § 76-5-103(2)(b)(ii) (2022). The case proceeded toward trial.

¶9 About a month before the scheduled trial date, the State submitted proposed jury instructions, and Counsel stipulated to

---

2. The quotations in paragraphs 4 through 6 come directly from officers' video footage of the incident in question, which was presented at trial and which is part of the record submitted to us. Other quotations in the factual recitation are taken from testimony offered during trial.

all of them. Notably, these agreed-upon instructions did not include any instructions regarding defense of others.

¶10    At trial, the State presented testimony from Girlfriend and Officer 2, who each testified to the facts outlined above. This testimony was accompanied by video evidence from the bodycams of Officer 1 and Officer 2. The State also presented testimony from a forensic nurse consultant with training in strangulation cases (Expert).

¶11    During Girlfriend's direct examination, the State played the bodycam footage and asked Girlfriend clarifying questions about it. On cross-examination, Counsel inquired about Girlfriend's memory of the night in question, which Girlfriend acknowledged was "[n]ot that great." Counsel also asked how meth typically affects Girlfriend's mental state and breathing, and Girlfriend acknowledged that meth can sometimes make her feel fearful and that she needs to run away, and that it can sometimes cause shortness of breath. Girlfriend also expressly denied ever biting Cartwright on the night in question. On redirect, Girlfriend clarified that she felt "a different level of shortness of breath" on the night of the incident compared to when she had previously used meth. She further recounted the pressure and weight she had felt when Cartwright was on top of her.

¶12    Next, Officer 2 testified that the wounds he saw on Cartwright at the hospital were "commonly defensive" wounds, meaning wounds typically "inflicted by somebody else in a defensive manner, usually to protect themselves." Officer 2 also testified that Cartwright told him that he had been awakened by Girlfriend "biting him." And Officer 2 stated that he had "noticed some dry blood on [Cartwright's] right shoulder, upper arm, and left forearm."

¶13    During her direct examination, Expert indicated that she had not examined Girlfriend and that she had not reviewed any reports associated with the case; instead, she testified about

strangulation generally. In so doing, she described several types of strangulation, including "[m]anual strangulation," in which a person applies pressure to the neck using a body part, and including "postural or positional asphyxia," a situation in which "the body is in a position where it cannot fully inflate the lungs," either because of "the way that the body is sitting" or because of "external pressure . . . being placed to the chest or the back" or to the "nose and/or the mouth," as happens during smothering. She explained that it only takes "33 pounds of pressure" on the front of the neck to occlude an airway, and "only about four and a half pounds of pressure" to occlude the jugular vein. And she testified that depriving the brain of oxygen, either by cutting off air supply or obstructing blood flow, can lead to death in "anywhere from as little as 62 seconds . . . to about two minutes." On cross-examination, Expert agreed that the use of a controlled substance could "affect someone's memory" and that many different things can cause scratch marks.

¶14 At the conclusion of the State's case, Counsel made a motion for a directed verdict, which the court denied. Thereafter, the defense rested without calling any witnesses, and both sides presented closing arguments.

¶15 In the State's closing argument, the prosecutor emphasized the video recordings and argued that "this case was about [Cartwright's] rage." The prosecutor argued that the most telling fact was Cartwright stating to Girlfriend that he was "going to kill" her and then "taking an action that regularly causes death."

¶16 Counsel's closing argument centered on the assertion that the State had failed to meet its "very heavy burden of proving [Cartwright's] guilt." Counsel argued that Girlfriend's testimony "was all over the place," noting that she couldn't remember key details like whether she felt pain during the incident or how long it lasted. Counsel asserted that Girlfriend's poor memory provided the jury "a reasonable doubt about" whether Cartwright

committed the charged crime. Counsel also argued that the testimonies of Officer 2 and Expert were unhelpful because neither of them could offer firsthand testimony about what happened. In particular, Counsel offered the view that Expert's testimony was unhelpful because Expert was "a blind expert witness" who "kn[ew] nothing about the case." And in an attempt to justify Cartwright's anger during the incident, Counsel posited that there could have been "all kinds of alternate explanations about why [Cartwright was] upset," including that Cartwright "was worried that [Girlfriend] was going to kill herself."

¶17 After deliberation, the jury found Cartwright guilty as charged. Later, the court sentenced Cartwright to prison.

### ISSUE AND STANDARD OF REVIEW

¶18 Cartwright now appeals his conviction, asserting that Counsel rendered constitutionally ineffective assistance. "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law, which we consider de novo." *State v. King*, 2018 UT App 190, ¶ 11, 437 P.3d 425 (cleaned up). Cartwright acknowledges that one of his ineffective assistance claims cannot be supported by the evidence in the record, and with regard to this claim, he seeks a remand, pursuant to rule 23B of the Utah Rules of Appellate Procedure, to enable him to supplement the record. "A remand under rule 23B is available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *State v. Tuinman*, 2023 UT App 83, ¶ 53, 535 P.3d 362 (cleaned up).

### ANALYSIS

¶19 To succeed on an ineffective assistance claim, a defendant must make a two-part showing. First, "the defendant must show

that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And second, "the defendant must show that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* A defendant must prove both elements to be successful. *See id.*

¶20    To demonstrate deficient performance, a defendant must show that "counsel's representation fell below an objective standard of reasonableness." *State v. Popp*, 2019 UT App 173, ¶ 26, 453 P.3d 657 (cleaned up). In evaluating the reasonableness of counsel's actions, courts often look to whether the actions counsel took were motivated by trial strategy. *See State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350 ("To be sure, the performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). And while "the ultimate question is not whether there was a possible strategic reason for counsel's conduct, but instead whether that conduct was objectively reasonable," *see id.*, "[i]f it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance," *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871.

¶21    To satisfy the second part of the test, the defendant must show that counsel's deficient performance resulted in prejudice. *See Strickland*, 466 U.S. at 687. "Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently." *State v. Whytock*, 2020 UT App 107, ¶ 28, 469 P.3d 1150. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. In assessing prejudice, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the

burden of showing that the decision reached would reasonably likely have been different absent the errors." *State v. Garcia*, 2017 UT 53, ¶ 28, 424 P.3d 171 (cleaned up).

¶22     In this case, Cartwright asks us to consider three ineffective assistance claims. First, he argues that Counsel provided ineffective assistance by not asking for a jury instruction regarding defense of others. Second, Cartwright argues that Counsel provided ineffective assistance by not objecting to certain questions that the State put to Girlfriend during her direct (and redirect) examination, which questions Cartwright characterizes as leading questions. And third, Cartwright argues that Counsel provided ineffective assistance by not seeking admission of medical records, generated by the hospital on the night in question, showing that Cartwright had sustained a human bite. Cartwright acknowledges that the current record does not support this third claim, so he has filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the trial court for additional factfinding. We discuss each of Cartwright's claims, in turn.

## I. Defense-of-Others Jury Instruction

¶23     Cartwright first claims that Counsel rendered ineffective assistance by opting not to ask for a jury instruction regarding defense of others. Specifically, Cartwright claims that such an instruction was warranted because his actions during the incident were justified in that "he acted with a reasonable belief that force was necessary to prevent Girlfriend from injuring herself." In response, the State argues that Counsel could have reasonably concluded that Cartwright was not entitled to such an instruction and that, even if he was, Counsel could have reasonably decided not to seek such an instruction because a defense-of-others

defense was unlikely to succeed on the facts of this case.[3] We agree with the State and conclude that Counsel did not perform deficiently by not asking for a defense-of-others instruction.

¶24   "When a criminal defendant requests a jury instruction regarding a particular affirmative defense, the court is obligated to give the instruction if evidence has been presented . . . that provides any reasonable basis upon which a jury could conclude that the affirmative defense applies to the defendant." *State v. Low*, 2008 UT 58, ¶ 25, 192 P.3d 867. "However, a court need not instruct the jury on the requested affirmative defense where the evidence is so slight as to be incapable of raising a reasonable doubt in the jury's mind as to whether the defendant acted in accordance with that affirmative defense." *State v. Burke*, 2011 UT App 168, ¶ 81, 256 P.3d 1102 (cleaned up).

¶25   Utah's justification statute provides, in relevant part, that "[a]n individual is justified in . . . using force against another individual when and to the extent that the individual reasonably believes that force . . . is necessary to defend . . . another individual against the imminent use of unlawful force." Utah Code § 76-2-402(2)(a). This defense applies when several elements are met.

¶26   First, "an individual is justified in . . . using force against another if and where he [or she] *reasonably believes* such force is

---

3. The State also posits that Counsel could have reasonably concluded that the defense-of-others defense did not apply because "the justification statute does not apply to the use of force to stop self-harm." In the State's view, the relevant statute authorizes the use of defensive force only when necessary to defend against "unlawful" force, *see* Utah Code § 76-2-402(2)(a), and it posits that self-harm "is not 'unlawful.'" Because we resolve this issue on other grounds, we need not weigh in on this argument, and we offer no opinion as to the merits of the State's position on this point.

*necessary.*" *State v. Sorbonne*, 2022 UT 5, ¶ 2, 506 P.3d 545 (emphasis added) (cleaned up). This necessity element "encompasses both a subjective and an objective component—the defendant must *believe* the force is necessary and the belief must be *reasonable* under the relevant circumstances." *Id.* (cleaned up). "[W]e evaluate defendants' beliefs—both the objective and the subjective components—as of the moment they used force." *State v. Wilcox*, 2025 UT 31, ¶ 43, 579 P.3d 277.

¶27 Second, the defendant must reasonably believe that danger is *imminent*. *See* Utah Code § 76-2-402(2)(a). This part of the inquiry also "has both a subjective and an objective component: the defendant must genuinely believe" that another individual "face[s] an imminent threat, and that belief must be reasonable." *Wilcox*, 2025 UT 31, ¶ 27. Relevant here is the objective part of the inquiry, which requires "courts to ask whether a reasonable person in the defendant's position would have believed" that another individual was "facing an imminent use of unlawful force." *See State v. Clara*, 2024 UT 10, ¶ 44, 546 P.3d 963.

¶28 And third, the defendant's use of force must be proportionate to the danger. "The law on self-defense [and defense of others] does not allow for disproportionate use of defensive force." *State v. Jennings*, 2026 UT 4, ¶ 53, 585 P.3d 1217 (cleaned up). "It is assault . . . when a defendant [uses defensive force] with a level of violence that is out of proportion to the provocation." *Id.* (cleaned up).

¶29 On the facts of this case, a competent attorney could have reasonably believed that the evidence presented at trial did not provide a sufficient basis to support a defense-of-others defense. And because "an attorney does not perform deficiently by failing to seek" particular relief when doing so "would be futile," *State v. Whytock*, 2020 UT App 107, ¶ 43, 469 P.3d 1150, Counsel did not perform deficiently, on this record, by not requesting a defense-of-others instruction.

¶30    The evidence does little to establish that Cartwright subjectively believed defensive force was necessary to protect Girlfriend. To be sure, he made statements to that effect after officers arrived on scene, telling them that he had been "helping" Girlfriend and, later, that she was "going to kill herself." But all other evidence in the record cuts the other way. When officers arrived, Cartwright was clearly angry, even shouting and swearing at the officers. Such behavior belies any subjective belief that Girlfriend had just been trying to commit suicide; indeed, a person who had just been trying to help a loved one fend off a suicide attempt would likely have been grateful for the appearance of police officers. Moreover, in the moment, Cartwright expressed no concern for Girlfriend, calling her a "criminal" and shouting that he intended to "take [her] to court" and that she would "go down for this." Thus, the evidence supporting Cartwright's contention that he had a *subjective* belief that defensive force was necessary to save Girlfriend from a suicide attempt is weak.

¶31    But the evidence supporting the notion that Cartwright had a subjective belief that force was necessary, as weak as it is, is stronger than the evidence supporting the other elements. The objective component of the necessity inquiry "is satisfied if the proverbial reasonable person in the defendant's position" would reasonably believe that defensive force was necessary. *Clara*, 2024 UT 10, ¶¶ 37, 44. Even assuming, for purposes of this part of the discussion, that Cartwright actually had a subjective belief that Girlfriend was going to kill herself and that use of defensive force was necessary to prevent that, there is no reasonable basis in the evidence to support the notion that any such belief was objectively reasonable. When Cartwright caught up to Girlfriend, she was on the ground, on her back, missing some of her clothing. There was no indication—other than Cartwright's own later statement—that Girlfriend was actually attempting to harm herself. And there was no evidence that, in the moment, she had any kind of weapon or other means (e.g., pills) of actually

committing self-harm. Indeed, Cartwright makes no effort to identify the method of suicide Girlfriend was attempting, and he does not attempt to explain how holding her down and applying force to her neck and throat could conceivably be calculated to deter any such effort. In short, given these facts, the evidence does not support a conclusion that any belief Cartwright might have had that use of such force was necessary to deter a suicide attempt was objectively reasonable.

¶32    Moreover, and for similar reasons, there is no reasonable basis to conclude that any suicide threat by Girlfriend was imminent. For a threat to be imminent, it must be "about to occur at any moment." *Id.* ¶ 36 (cleaned up). Cartwright's actions leading up to his use of force do not suggest that he believed Girlfriend was in imminent danger. After Cartwright chased her out of the car, events paused for a few minutes while "some guy [from] across the street . . . came over and handed" Girlfriend a soft drink. There is no evidence that Cartwright asked this bystander for help or that Cartwright attempted to use defensive force at that time. A few minutes later, when Cartwright actually did apply force to Girlfriend, there is likewise no indication—aside from Cartwright's later statement to officers—that Girlfriend was in any imminent danger of self-harm. As noted, there is no evidence that Girlfriend had any actual means of immediate self-harm. Indeed, even Cartwright's own initial statements to police—shouting profanities, claiming that he had been "helping" Girlfriend, and threatening to "take [her] to court"—were not indicative of the presence of any imminent threat of self-harm. It's notable that Cartwright did not immediately ask officers to attend to Girlfriend, something one would have expected him to do if a threat of self-harm were imminent at that moment.

¶33    Finally, the force Cartwright used on Girlfriend was entirely disproportionate to any perceived threat of immediate self-harm. Even if we assume, for purposes of this part of the

discussion, that some evidence existed indicating that Girlfriend was attempting self-harm in that moment, Cartwright does not explain how holding her down and applying force to her face and throat for "30 seconds to one minute"—as opposed to, say, hugging her, attempting to reason with her, or attempting to disarm her—would be effective and proportionate in helping someone overcome a threat of self-harm.

¶34 Accordingly, Counsel could have reasonably concluded that, on this record, there was not a reasonable basis in the evidence to support a request for a defense-of-others instruction. On this basis, we conclude that Counsel did not perform deficiently by not requesting such an instruction.[4]

## II. Leading Questions

¶35 Next, Cartwright claims that Counsel rendered ineffective assistance by not objecting to certain questions the prosecutor asked Girlfriend during direct (and redirect) examination. Cartwright asserts that the questions were leading and were objectionable on that basis. In response, the State asserts that some of the identified questions were not in fact leading and that, for

---

4. For similar reasons, we also agree with the State's position that Counsel could also have concluded that—even if there were some remote chance that the trial court might have granted a request for a defense-of-others instruction—a defense-of-others defense was extremely unlikely to succeed and that Counsel would have been wise to focus her efforts elsewhere. *See State v. King*, 2024 UT App 151, ¶ 34, 559 P.3d 96 (stating that where "there was little, if anything, to be gained" by making a request, counsel "could reasonably have decided not to bother"). And for similar reasons, we agree with the State that, even if Counsel had succeeded in persuading the court to give a defense-of-others instruction in this case, there is no reasonable likelihood of a different outcome.

the others, Counsel could have reasonably opted not to lodge an objection anyway. We agree with the State.

¶36    Under our rules of evidence, "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." Utah R. Evid. 611(c). "A leading question suggests its answer." *State v. Isom*, 2015 UT App 160, ¶ 65, 354 P.3d 791. "The vice in a leading question is that it in effect puts words in the witness's mouth so the testimony is really that of the questioner and not the witness." *Id.* (cleaned up). "This usually occurs in so framing a question that it assumes a fact to be true, or in reciting a fact and merely seeking affirmation from the witness, or in so phrasing the question as to suggest the desired answer." *Id.* (cleaned up). A question is not considered "leading" merely because it calls for a "yes" or "no" answer; such questions "are not leading unless they are unduly suggestive under the circumstances." *Id.* (cleaned up).

¶37    Here, Cartwright identifies seven exchanges between the prosecutor and Girlfriend in which he claims the prosecutor asked Girlfriend leading questions. Those exchanges are quoted in full below. In our view, Counsel could reasonably have concluded that the first four exchanges contain no leading questions. And although the other three exchanges do contain leading questions, Cartwright has not borne his burden of showing that Counsel rendered ineffective assistance by not objecting to them. We address each exchange in turn.

A.    Exchanges Without Leading Questions

¶38    With regard to four of the identified exchanges, Counsel could reasonably have concluded that none of the prosecutor's questions were objectionably leading, and she could therefore have reasonably believed that any objection would be futile. After all, choosing not "to raise futile objections does not constitute ineffective assistance of counsel." *State v. Christensen*, 2014 UT App 166, ¶ 10, 331 P.3d 1128 (cleaned up).

¶39   The first instance occurred during direct examination:

Q: [C]ould you breathe freely [when Cartwright was on top of you]?
A: Yeah, I was trying to, but yeah.
Q: So when you say you were "trying to," does that mean you couldn't?
A: I couldn't scream.
Q: Okay. Could you breathe?
A: For a second. But at—this only happened for a second. It didn't last that long.

¶40   Counsel could reasonably have concluded that this exchange didn't contain any leading questions. Immediately before the exchange, Girlfriend had testified that Cartwright had been "on top of [her] and holding [her] down." The prosecutor asking Girlfriend to clarify the extent of her ability to breathe while Cartwright was on top of her and holding her down does not suggest that she could or could not breathe. To be sure, these questions called for "yes" or "no" answers, but as already noted, such questions "are not leading unless they are unduly suggestive under the circumstances." *Isom*, 2015 UT App 160, ¶ 65 (cleaned up). And Counsel could reasonably have believed that these questions were not unduly suggestive.

¶41   The second instance also occurred on direct examination:

Q: How did [Cartwright's hands] feel on your throat?
A: It was—it was like dry mouth, like cotton mouth, dry, like, you just can't seem to swallow, is what it felt like.
Q: Was there any kind of pain?
A: It was just kind of like you can't swallow, is what it felt like.

> Q: Okay. And if you couldn't swallow, does that mean you couldn't breathe?
>
> A: Yeah.

¶42   Similarly here, Counsel could reasonably have believed that the prosecutor's questions were not leading. While two of them did seek "yes" or "no" responses, Counsel could have concluded that neither of them—even the one asking Girlfriend to compare her inability to swallow with a potential inability to breathe—was suggestive enough to warrant an objection.

¶43   The third instance likewise occurred during direct examination. Immediately prior to this exchange, Girlfriend testified that, at some point, Cartwright had stopped putting his hands on her mouth, and the prosecutor asked questions aimed at placing that moment into a timeline:

> Q: Was there anything that you saw that you believed caused it to stop? Like, was there anyone else there that showed up, or anything like that?
>
> A: No.
>
> Q: Did the cops ever arrive?
>
> A: Yeah, the cops finally came.
>
> Q: Okay. And when did they come?
>
> A: Oh, I don't even remember. This happened—this was, like, I can't even—shortly after—after the fact of after I got out of the car. I don't even remember what time that was.
>
> Q: Is that when the pressure on your chest and the hands on your neck and over your mouth stopped, is when the cops got there?
>
> A: Yeah.

¶44   For similar reasons, Counsel could have believed that these questions were not unduly suggestive. Asking whether police ever arrived is not leading, particularly when evidence of police

officer involvement had already been introduced. And asking if the arrival of the police was the event that spurred Cartwright to release the pressure on her throat is not an unduly suggestive question, especially here, when much of that information had already been established through Girlfriend's prior testimony. Or, at least, Counsel could have reasonably so concluded.

¶45    The fourth instance occurred on redirect:

> Q: [W]hat about the hand on your neck? Was that holding you gently, or was there pressure?
> A: That was holding me. It was—it was soft.
> Q: It was soft?
> A: Yeah.
> Q: Was there any kind of pressure?
> A: No.
> Q: No pressure at all?
> A: Well, there was—I was—wasn't able to get up, is what it was.
> Q: Okay. Do you remember any kind of squeezing, or the hand was just there, no pressure?
> A: It was there.
> Q: Just there.
> A: Yeah.
> Q: Okay. But you couldn't breathe?
> A: Yeah, I couldn't breathe.

¶46    Again, Counsel could have reasonably concluded that these questions were not unduly suggestive. Here, the prosecutor merely sought additional details about Girlfriend's prior testimony. Girlfriend had previously testified that Cartwright's hands had been on her neck and that she had not been able to breathe. These follow-up questions asked Girlfriend to provide additional details about that pressure. In context, Counsel could have reasonably believed that these questions were not leading and therefore not objectionable.

¶47 For these reasons, Counsel did not render deficient performance by not objecting to these four exchanges between the prosecutor and Girlfriend.

B.        Exchanges Containing Leading Questions

¶48 The other three exchanges, however, did contain questions that were objectionable as leading. But we nevertheless conclude that Cartwright cannot demonstrate ineffective assistance here, both because Counsel could reasonably have decided not to object to many of them and because, in any event, Cartwright cannot demonstrate that any prejudice resulted from Counsel's decision not to object to these questions.

¶49 Applicable performance standards do not require competent defense attorneys "to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, in deciding whether to lodge objections, attorneys are entitled to "pick [their] battles," and they do not have "a Sixth Amendment obligation" to object to everything. *State v. Ray*, 2020 UT 12, ¶ 32, 469 P.3d 871; *see also State v. Hart*, 2020 UT App 25, ¶ 29, 460 P.3d 604 ("[J]ust because counsel *can* make an objection does not mean counsel *must* make an objection to avoid rendering ineffective assistance. Legal objections are an inherently strategic business."). "We must view a decision to not object in context and determine whether . . . failure to do so was objectively unreasonable—i.e., a battle that competent counsel would have fought." *Ray*, 2020 UT 12, ¶ 32.

¶50 Moreover, "[p]rejudice analysis is counterfactual. To decide whether a trial affected by error is reasonably likely to have turned out differently we have to consider a hypothetical—an alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86; *see also State v. Soto*, 2022 UT App 107, ¶ 25, 518 P.3d 157 ("Under a counterfactual analysis, we consider whether, in the absence of the improperly admitted

evidence, the likelihood of a different outcome is sufficiently high to undermine our confidence in the verdict." (cleaned up)).

¶51 The fifth instance occurred on direct examination, after the jury had viewed the video footage of Girlfriend's on-scene interview and after the prosecutor asked Girlfriend to clarify some of the statements she made during the interview:

> Q: What were you comparing that to when you said you could breathe better?
> A: I don't know.
> Q: Like, earlier?
> A: From earlier—
> Q: —before the cops got there?
> A: Yeah.
> Q: Okay. So that—does that mean that when that was—when [Cartwright] was doing that, that you couldn't breathe very well?
> A: Yeah.

¶52 The last question posed by the prosecutor during this exchange constitutes a leading question: it suggests its answer and is unduly suggestive. This is an instance of the questioner putting "words in the witness's mouth so the testimony is really that of the questioner and not the witness." *State v. Isom*, 2015 UT App 160, ¶ 65, 354 P.3d 791 (cleaned up). Counsel could have objected to this question, and such an objection would likely have been sustained.

¶53 But, as stated, an attorney need not always lodge even a valid objection. *See Hart*, 2020 UT App 25, ¶ 29. Here, Counsel could have reasonably viewed an objection to this question as a battle not worth fighting. The jury had already seen the interview video footage in which Girlfriend stated she had difficulty breathing when Cartwright was on top of her. Had Counsel objected, the prosecutor would have been afforded an opportunity to rephrase the question and may have succeeded in

eliciting the same testimony anyway. Counsel could have further believed that this would have simply served to re-emphasize the point in a way that could have been harmful to the defense. Thus, Counsel could reasonably have opted not to fight this battle.

¶54    And in any event, we discern no reasonable probability of prejudice from Counsel's decision to forgo an objection to this question. The jury had already seen and heard the substance of the testimony in question, and even if the jury had not heard the prosecutor's leading question and Girlfriend's subsequent response, the outcome would very likely have been the same.

¶55    The sixth instance occurred after the jury viewed body cam footage of Girlfriend's interview at the scene:

> Q: Do you remember why you were breathing hard?
> A: I couldn't breathe—well, it was because of the chase that I was running—it was hard to breathe.
> Q: Okay.
> A: Yeah.
> Q: Was it—did it have anything to do with that weight on your chest or the—
> A: Yeah.
> Q: —hands at your throat?
> A: Well, it was from running.
> Q: Okay.
> A: Yeah.
> Q: Was it also anything to do with that?
> A: Yeah.
> Q: With the—the hands on the throat?
> A: Yeah.

¶56    This exchange also contains leading questions, because Girlfriend gave an answer to a question about why she had been breathing hard that the prosecutor apparently did not like, and the prosecutor then asked leading follow-up questions designed

to elicit a different and more specific answer. Thus, Counsel could have lodged an objection, and it may well have succeeded.

¶57 But Counsel could also have reasonably opted not to lodge an objection. It is intuitive that having a person's hands on one's throat will impair one's ability to breathe. And the jury had already seen the interview video in which Girlfriend spoke through clearly labored breathing and told Officer 1 that she felt like she was going to "pass out." She also told officers that she had trouble breathing normally when Cartwright was on top of her. And as above, the prosecutor would have been afforded an opportunity to rephrase the question and re-emphasize the point, and may well have been able to elicit the same response anyway.

¶58 Moreover, even if the prosecutor had not been able to elicit the same response to a better-phrased question, we discern no reasonable probability of a different trial outcome. As noted, the jury had already heard the substance of the response through the video evidence, and excising this exchange from the trial would not have been likely to lead to a different result.

¶59 The seventh instance occurred on redirect:

> Q: So was the bulk of his body resting on your chest?
> A: I—I don't remember.
> Q: You don't remember? Do you remember feeling a weight when he was on top of you?
> A: Somewhat, yeah.
> Q: Okay. Do you remember it ever feeling, like, heavy?
> A: Yeah.
> Q: Like you couldn't get up if you wanted to?
> A: Yeah.
> Q: And it was holding you down, pressing—
> A: Yes. Yes.

¶60    Again, similar to the two prior instances, this exchange contains leading questions—especially toward the end—because Girlfriend gave an initial explanation that the prosecutor wasn't satisfied with, and the prosecutor then asked follow-up questions that suggested a different answer. As with the last two exchanges, Counsel could have lodged an objection, and that objection likely would have been sustained.

¶61    But as with the last two exchanges, a competent attorney could have viewed this as a battle not worth fighting because of the ample other evidence establishing that Cartwright had been on top of Girlfriend and holding her down, and the jurors would intuitively have understood that having a grown man on top of another person would cause that person to feel weight and pressure. And in any event, Cartwright has not come close to demonstrating that any prejudice resulted from these questions having been asked.

¶62    For these reasons, Cartwright has not demonstrated that Counsel rendered ineffective assistance by not objecting to these three exchanges. Although some of the questions were leading, competent counsel could have viewed those leading questions as battles not worth fighting and chosen, as Counsel did here, not to object. Additionally, Cartwright has not shown that he was prejudiced by any of those questions.

### III.  Cartwright's Medical Records

¶63    Finally, Cartwright claims that Counsel rendered ineffective assistance by not seeking admission of medical records demonstrating that Cartwright had been the victim of a "human bite" on the day in question. Cartwright asserts that these records could have been used to impeach Girlfriend's express denial that she had bitten Cartwright at the outset of the episode, while the two were still in their car. These medical records are not contained in the record, so Cartwright asks us to consider his motion, filed pursuant to rule 23B of the Utah Rules of Appellate Procedure,

seeking an order remanding this case to the trial court to supplement the record with these medical records.

¶64    To obtain a remand order under rule 23B, the defendant must make a four-part showing. First, the motion "must be supported by affidavits setting forth facts that are not contained in the existing record." *State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719 (cleaned up). Second, those affidavits must contain "allegations of fact that are not speculative." *Id.* (cleaned up). Third, the allegations contained in the affidavits "must show deficient performance by counsel." *Id.* (cleaned up). And finally, the affidavits "must also allege facts that show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* (cleaned up). Importantly, the third and fourth elements require the defendant to "present the court with the evidence he [or she] intends to present on remand and explain how that evidence supports both prongs of the ineffective assistance of counsel test." *State v. Mason*, 2024 UT App 171, ¶ 63, 562 P.3d 1158 (cleaned up), *cert. denied*, 570 P.3d 658 (Utah 2025). "[I]f the defendant could not meet the test for ineffective assistance of counsel, even if his [or her] new factual allegations were true, there is no reason to remand the case, and we should deny the motion." *State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3d 1166. Here, even assuming—without deciding—that Counsel performed deficiently in not seeking the admission of Cartwright's medical records, Cartwright has not demonstrated that he was prejudiced by that decision.

¶65    At trial, evidence was presented—in the form of, among other things, a statement Cartwright made to police at the scene— that Girlfriend bit him at the outset of the encounter, while they were still in the car. Officer 2 also testified that he had "noticed some dry blood on [Cartwright's] right shoulder, upper arm, and left forearm." But Girlfriend, during her testimony, flatly denied that she had bitten Cartwright. Thus, the medical records showing

that Cartwright had in fact been the victim of a "human bite" on the day in question could have been used to impeach Girlfriend.

¶66    But that is the extent of their evidentiary value; indeed, Cartwright does not argue that he could have used the medical records for any other purpose. In particular, he does not contend that Girlfriend's bite spurred him to defend himself. After all, the bite in question occurred many minutes *before* Cartwright's assaultive acts, and she was attempting to run away from him, not bite him further.

¶67    In this case, the impeachment value of the medical records is just not weighty enough to persuade us that a different trial outcome would have been likely if the jury had seen the medical records. Evidence of the bite's existence was already fairly strong, as it included not only Cartwright's on-scene statement but also Officer 2's testimony about blood on Cartwright's shoulder and arm. And Girlfriend readily admitted that her memory of the events in question was "[n]ot that great." Introducing these medical records would have thus strengthened Cartwright's contention that Girlfriend bit him, but it would have had little to say about the more substantive issues surrounding the assaultive acts for which he was charged. And on that score, the evidence against Cartwright was strong, for reasons already discussed. Thus, we conclude that Cartwright has failed to demonstrate a reasonable probability of a different outcome in a hypothetical trial in which the jury saw the medical records demonstrating that he had been the victim of a human bite on the day in question.

CONCLUSION

¶68    For all of these reasons, we reject each of Cartwright's ineffective assistance arguments, deny his rule 23B motion, and affirm his conviction.

———————